2005 Mar-22 AM 08:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA, a public corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | Civ. Action No._____ |
| v. | ) ) | |
| NEW LIFE ART, INC. and DANIEL A. MOORE, | ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff The Board of Trustees of the University of Alabama, a public corpora-tion ("University of Alabama," the "University" or "Plaintiff") states the following for its complaint against New Life Art, Inc. and Daniel A. Moore (collectively "Defendants"):

### PRELIMINARY STATEMENT

1.    Defendant Daniel Moore is a commercial artist who has made substantial sums from, and developed a reputation based largely on, relationships with the University of Alabama and on commercial prints and designs featuring and capitalizing on the University's trademarks and identity. At the outset of his relationship with the University and for many years as an official licensee, Mr. Moore properly acknowledged the University's ownership and control of its colors and symbols. In 2000, however, Mr. Moore embarked on a course of conduct in violation of the University's rights – both by breaching his earlier contracts and refusing to respect the University's intellectual property on a going-forward basis. To redress Mr. Moore's various wrongs, this is an

action at law and in equity for breach of contract and for trademark infringement and unfair competition, arising under the Trademark Act of 1946, 15 U.S.C. §§ 1051 et. seq., ("Lanham Act"); the antidilution laws of the several states, including the Alabama antidilution statute, ALA. CODE § 8-12-17; and the common law.

## JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction under section 39 of the Lanham Act, 15 U.S.C. §1121, and under 28 U.S.C. §§ 1331 and 1338. This Court has jurisdiction over Plaintiff's related state and common-law claims pursuant to 28 U.S.C. §§ 1338 and 1367.

3.    This Court has personal jurisdiction over Defendants because Defendants reside in this State, have distributed or sold infringing merchandise or services within this State, have engaged in acts or omissions within this State causing injury, and have otherwise made or established contacts with this State sufficient to permit the exercise of personal jurisdiction. This District is a proper venue pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## THE PARTIES

4.    Plaintiff The Board of Trustees of the University of Alabama is a public corporation and instrumentality of the State of Alabama organized and existing under the constitution and laws of the State of Alabama, having its principal place of business in Tuscaloosa, Alabama 35487. The governing body of the corporate University is the Board of Trustees of the University of Alabama.

2

5.     Defendant New Life Art, Inc. is an Alabama corporation with a principal place of business in Birmingham, Alabama, 35216.

6.     Defendant Daniel A. Moore is a citizen of Alabama who resides in Birmingham, Alabama 35226, and is a principal in New Life Art, Inc.

## FACTUAL BACKGROUND

7.     The University of Alabama, the State's flagship educational institution, was founded in 1831, and is the oldest public university in the state of Alabama. The University offers a wide-range of undergraduate, graduate and professional programs for its more than 20,000 students, and is consistently ranked as one of the top 50 public universities in the nation. In addition, the University's graduates include 15 Rhodes Scholars, 15 Goldwater Scholars, nine Truman Scholars, and one Portz Scholar.

8.     The University also has a long tradition of athletic excellence. The University's football team began playing at the intercollegiate level in 1892 and has won twelve national championships. The University's football, basketball and baseball teams have won a combined forty-one Southeastern Conference championships. The University's most famous athletic celebrity, Paul W. "Bear" Bryant, served as head football coach at the University from 1958 through 1982. During that reign, Coach Bryant coached six national championship teams, was named national coach of the year three times, and was named Southeastern Conference coach of the year eight times. On November 28, 1981, Coach Bryant became the then winningest football coach in the history of college football, and retired after having won 323 games.

9.     There is a significant market among University alumni and others for items that commemorate the University and the University's significant athletic

3

successes, from t-shirts and baseball caps, to pennants, stickers, license plate holders, coffee cups, mugs, banners, video games, posters, and the like.

10.    Commercial prints, usually depicting scenes from a University game or figures from the University's athletic program, are one category of licensed goods.

11.    A color copy of such a commercial print – one that was produced by Mr. Moore and licensed by Plaintiff – *The Interception*, is attached to this Complaint as Exhibit A.

12.    Commercial prints of this type capitalize and trade on the identity and goodwill of the University of Alabama. *Inter alia*, they are drenched in the University's color scheme. The University of Alabama has used "crimson and white" in connection with its athletic and other uniforms, and on its licensed apparel and other merchandise, as an element of its logos and design marks and in numerous additional contexts, all contributing to the color scheme's power to serve as a University identifier.

13.    Approximately 75 years ago, the University also adopted an elephant as its "mascot." Several versions of this mascot are approved by and used as trademarks throughout the marketing and promotion of the University and its programs. Plaintiff owns numerous federal registrations consisting of or incorporating depictions of its Elephant Design Mark, including Registration Numbers 1,351,302, 1,325,940, 1,322,955, and 1,318,889. Copies of the Certifications of Registration for these federal registrations are attached as Exhibit B.

14.    The University's athletic teams are known as the CRIMSON TIDE, and "ROLL TIDE" is a familiar cheer from Alabama faithful. These words evoke an immediate association with the University. The University also has used these terms as

4

trademarks for its own goods and services, and owns federal registrations for both –
CRIMSON TIDE (Reg. No. 1,338,772) and ROLL TIDE Mark (Reg. No. 1,335,032).
Copies of the Certificates of Registration for these federal registrations are attached as
Exhibit C. As they are common elements of the University's identity, these word marks
are often included in commercial prints such as those produced by Mr. Moore.

15.    The University of Alabama is also known as BAMA, and the University
has promoted and used the shorthand term BAMA such that the consuming public
associates the term BAMA with the University. Plaintiff owns a federal registration for
the BAMA Mark, Reg. No. 1,526,504. A copy of the Certificate of Registration for this
mark is attached as Exhibit D.

16.    The crimson and white color scheme, uniforms, Elephant Design Mark,
CRIMSON TIDE Mark, ROLL TIDE Mark, and BAMA Mark are used prominently and
repeatedly in connection with the University of Alabama's athletic teams and the
University's many other organizations, activities and services, as well as in connection
with goods sold by the University or its licensees. The University of Alabama
extensively and continuously used and promoted these marks before the activities of
Defendants outlined in this Complaint, and it continues to do so. These marks have
achieved tremendous fame and public recognition, and the public understands that these
marks identify goods and services produced or licensed by, or otherwise associated or
affiliated with the University of Alabama. Revenue derived from the use of these marks
is an important source of funds for scholarships and for educational and athletic programs
of the University – a fact of which the public is aware.

ATLLIB01 1911294.4

17.    Because of the strong association of the marks with the University, many alumni and others believe that commercial prints of the sort depicted in Exhibit A must be licensed or sponsored by the University.  The value of the University's identity and a desire to associate with the University and support its programs are the triggering mechanisms for sales of these products.  The University of Alabama has a right and an obligation to control use of indicia that evoke its identity and call it to mind among alumni, fans, donors, and other potential purchasers of commemorative merchandise.

18.    Mr. Moore is familiar with and has acknowledged the University's rights in numerous written licensing agreements.  In 1981 the University's agent approached Defendants and suggested that Defendants create a print to commemorate the 315th victory of Coach Bryant.  The parties entered into an agreement under which the University authorized Defendants to use the University's indicia to create this print.  Additionally, the University aided in the print's promotion and permitted Defendants to call this print an "official print," all to Defendant's substantial and continuing benefit.

19.    After the initial agreement, the University and Defendants entered into license agreements regarding subsequent prints by Defendants relating to or referring to the University, through June 30, 2000.  An example of such an agreement is attached as Exhibit E.

20.    In addition, in September of 1997, Defendants entered into a licensing agreement with Collegiate Sports Partners, Ltd. on behalf of the estate of Coach Bryant (the "September 1997 License"), under which Defendants would produce and sell products bearing artwork used for the Paul W. Bryant postage stamp that Defendants created

for the United States Postal Service. The agreement provided that the University, as third party beneficiary, would receive a portion of the net sales of products thereunder.

21.    In 2000, Defendants asserted that they no longer required licenses to use the University's marks in commercial prints, and Defendants have not entered into any licenses with the University after June 30, 2000.

22.    Defendants, however, have reissued earlier licensed prints, even "limited edition" versions; have produced coffee mugs and other merchandise bearing previously-licensed prints and University indicia; and have published and sold new commercial prints and mugs utilizing the University's marks – all without involvement of or payment of licensing fees to the University and without notice (or a reduced price) to the public.

### FIRST CLAIM FOR RELIEF

### (Breach of Contract)

23.    Plaintiff repeats and incorporates by reference the allegations in paragraphs 1-22.

24.    The September 1997 License is a valid contract, which was duly executed by Defendants.

25.    Defendants have breached the September 1997 License by failing to make timely payment of sums due and owing to Plaintiff.

26.    As a result of Defendants' breach of the September 1997 License, Plaintiff has suffered damages in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF

### (Breach of Contract)

7

27.     Plaintiff repeats and incorporates by reference the allegations in paragraphs 1-26.

28.     The license agreements relating to the use of Plaintiff's marks from 1981 through June 30, 2000 (the "Trademark Licenses") are valid contracts, which were duly executed by Defendants.

29.     Defendants have breached the Trademark Licenses by, *inter alia*, refusing to make payments of sums due and owing to the University based on the reissue of previously-licensed prints and mugs, including "limited edition" prints, and by producing and selling new commercial prints and mugs.

30.     Defendants' breach of the Trademark Licenses has caused and continues to cause harm to Plaintiff and to Plaintiff's good name and reputation.

31.     As a result of Defendants' breaches of the Trademark Licenses, Plaintiff has suffered damages in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

### (Federal Unfair Competition – Reissue of Prints)

32.     Plaintiff repeats and incorporates by reference the allegations in paragraphs 1-31.

33.     Defendants' use of confusingly similar imitations of Plaintiff's marks in connection with the reissue of prints on which Defendants previously paid royalties to the University, and which the University sponsored, has caused and is likely to cause confusion, deception, and mistake by creating the false and misleading impression that Defendants' goods are made or distributed by Plaintiff, or are affiliated, connected or associated with Plaintiff, or have the sponsorship, endorsement, or approval of Plaintiff.

ATLLIB01 1911294.4

34.    Defendants have made false representations, false descriptions, and false designations of origin of these reissued prints in violation of 15 U.S.C. § 1125(a), and Defendants' activities have caused and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the public and, additionally, injury to Plaintiff's reputation and goodwill symbolized by its marks, for which Plaintiff has no adequate remedy at law.

35.    Defendants' actions regarding the reissue of previously-licensed prints demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Plaintiff's marks to the great and irreparable injury of Plaintiff.

36.    Defendants' conduct has caused, and is likely to continue causing, substantial injury to the public and to Plaintiff, and Plaintiff is entitled to injunctive relief and to recover Defendants' profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1125(a), 1116 and 1117.

## FOURTH CLAIM FOR RELIEF

### (Federal Unfair Competition – Sale of Mugs Bearing Prints)

37.    Plaintiff repeats and incorporates by reference the allegations in paragraphs 1-36.

38.    Defendants' sale of coffee mugs bearing University indicia and new commercial prints or prints previously the subject of licensing agreements with the University constitutes a use of confusingly similar imitations of Plaintiff's marks and has caused and is likely to cause confusion, deception, and mistake by creating the false and misleading impression that Defendants' mugs are made or distributed by Plaintiff, or are affiliated,

9

connected or associated with Plaintiff, or have the sponsorship, endorsement, or approval of Plaintiff.

39.     Defendants have made false representations, false descriptions, and false designations of origin of these mugs bearing new commercial prints or previously-licensed prints in violation of 15 U.S.C. § 1125(a), and Defendants' activities have caused and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the public and, additionally, injury to Plaintiff's reputation and goodwill symbolized by its marks, for which Plaintiff has no adequate remedy at law.

40.     Defendants' actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Plaintiff's marks to the great and irreparable injury of Plaintiff.

41.     Defendants' conduct regarding the sale of coffee mugs bearing new commercial prints or previously-licensed prints has caused, and is likely to continue causing, substantial injury to the public and to Plaintiff, and Plaintiff is entitled to injunctive relief and to recover Defendants' profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1125(a), 1116 and 1117.

## FIFTH CLAIM FOR RELIEF

### (Federal Unfair Competition – New Prints)

42.     Plaintiff repeats and incorporates by reference the allegations in paragraphs 1-41.

ATLLIB01 1911294.4

43.    Defendants' use of confusingly similar imitations of Plaintiff's marks in connection with the issue of new commercial prints without signing a license to use such marks has caused and is likely to cause confusion, deception, and mistake by creating the false and misleading impression that Defendants' goods are made or distributed by Plaintiff, or are affiliated, connected or associated with Plaintiff, or have the sponsorship, endorsement, or approval of Plaintiff.

44.    Defendants have made false representations, false descriptions, and false designations of origin of these unlicensed new prints bearing the University's marks in violation of 15 U.S.C. § 1125(a), and Defendants' activities have caused and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the public and, additionally, injury to Plaintiff's reputation and goodwill symbolized by its marks, for which Plaintiff has no adequate remedy at law.

45.    Defendants' actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Plaintiff's marks to the great and irreparable injury of Plaintiff.

46.    Defendants' conduct regarding the creation and sale of these unlicensed prints bearing the University's marks has caused, and is likely to continue causing, substantial injury to the public and to Plaintiff, and Plaintiff is entitled to injunctive relief and to recover Defendants' profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1125(a), 1116 and 1117.

## SIXTH CLAIM FOR RELIEF

### (State Trademark Dilution and Injury to Business Reputation)

ATLLIB01 1911294.4

47.    Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1-46.

48.    Plaintiff has extensively and continuously promoted and used its marks, including but not limited to its crimson and white color scheme, throughout the United States and the State of Alabama, and the marks have become distinctive, famous and well-known symbols of Plaintiff's goods and services well before Defendants offered for sale the merchandise complained of in this Complaint.

49.    Defendants' unauthorized use of Plaintiff's marks dilutes and is likely to dilute the distinctiveness of Plaintiff's marks by eroding the public's exclusive identification of these famous marks with Plaintiff, and tarnishing and degrading the positive associations and prestigious connotations of the marks.

50.    Defendants are causing and will continue to cause irreparable injury to Plaintiff's goodwill and business reputation, and dilution of the distinctiveness and value of Plaintiff's famous and distinctive marks, including but not limited to Plaintiff's crimson and white color scheme, in violation of the Alabama antidilution provision, ALA. CODE § 8-12-17 (2003), as well as the antidilution laws of the several states, including Georgia, O.C.G.A. §10-1-451 (1994), Florida, FLA. STAT. ANN. §495.151 (West 2003), and Louisiana, LA. REV. STAT. ANN. § 51:223.1 (West 2003).

**SEVENTH CLAIM FOR RELIEF**

**(Common Law Trademark Infringement and Unfair Competition)**

51.    Plaintiff repeats and incorporates by reference the allegations in paragraphs 1-50.

12

52.    Defendants' acts constitute common law trademark infringement and unfair competition, and have created and will continue to create a likelihood of confusion to the irreparable injury of Plaintiff unless restrained by this Court. Plaintiff has no adequate remedy at law for this injury.

53.    Defendants acted with full knowledge of Plaintiff's use of, and statutory and common-law rights to, its marks including, but not limited to, Plaintiff's crimson and white color scheme, and have acted without regard to the likelihood of confusion of the public created by Defendants' activities.

54.    Defendants' actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Plaintiff's marks to the great and irreparable injury of Plaintiff.

55.    As a result of Defendants' acts, Plaintiff has been damaged in an amount not as yet determined or ascertainable. At a minimum, however, Plaintiff is entitled to injunctive relief, to an accounting of Defendants' profits, to damages, and to costs.

### EIGHTH CLAIM FOR RELIEF

### (Unjust Enrichment)

56.    Plaintiff repeats and incorporates by reference the allegations in paragraphs 1-55.

57.    Defendants, upon obtaining a license to use the University's marks, raised the prices of their merchandise to reflect a sponsorship by and affiliation with the University. The additional monies were used, in part, to pay a reasonable royalty rate to the University for the use of Plaintiff's marks.

ATLLIB01 1911294.4

58.     Upon expiration of the final license agreement, Defendants knowingly and willfully continued to sell their infringing merchandise at the increased prices, failed to reflect its lack of sponsorship by the University, and failed to make royalty payments to the University for use of Plaintiff's marks.

59.     Defendants have been and continue to be unjustly enriched by the excess payments, which inured to the benefit of and conferred substantial value on Defendants, to the detriment of Plaintiff.

60.     As a result of Defendants' acts, Plaintiff has been damaged in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

1.     Defendants and all of their agents, officers, employees, representatives, successors, assigns, attorneys, and all other persons acting for, with, by, through, or under authority from Defendants, or in concert or participation with Defendants, and each of them, be enjoined permanently, from:

(a)     using Plaintiff's marks, including but not limited to Plaintiff's famous crimson and white color scheme, or any other copy, reproduction, or colorable imitation or simulation of Plaintiff's marks on or in connection with Defendants' goods or services;

(b)     using any trademark, service mark, name, logo, color scheme, design or source designation of any kind on or in connection with Defendants' goods or services that is a copy, reproduction, colorable

14

imitation, or simulation of, or confusingly similar to, or in any way similar to the marks of Plaintiff;

(c)    using any trademark, trade dress, service mark, name, logo, color scheme, design or source designation of any kind on or in connection with Defendants' goods or services that is likely to cause confusion, mistake, deception, or public misunderstanding that such goods or services are produced or provided by Plaintiff, or are sponsored or authorized by Plaintiff or are in any way connected or related to Plaintiff;

(d)    using any trademark, trade dress, service mark, name, logo, color scheme, design or source designation of any kind on or in connection with Defendants' goods or services that dilutes or is likely to dilute the distinctiveness of the trademarks, trade dress, service marks, names, color schemes, or logos of Plaintiff; and

(e)    passing off, palming off, or assisting in passing off or palming off, Defendants' goods or services as those of Plaintiff, or otherwise continuing any and all acts of unfair competition as alleged in this Complaint.

2.    Defendants, their agents, officers, employees, representatives, successors, assigns, attorneys, and all other persons acting for, with, by, through, or under authority from Defendants, or in concert or participation with Defendants, and each of them, be compelled to account to Plaintiff for any and all profits derived by Defendants from the sale or distribution of infringing goods or services as described in this Complaint;

15

3.    Plaintiff be awarded all damages caused by the acts forming the basis for this Complaint;

4.    Based on Defendants' knowing and intentional use of confusingly similar imitations of Plaintiffs' marks, the damages award be trebled and the award of Defendants' profits be enhanced as provided for by 15 U.S.C. § 1117(a);

5.    Defendants be required to pay to Plaintiff the costs of this action and its reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a) and the state statutes cited in this Complaint; and

6.    Plaintiff be awarded such other and further relief as the Court may deem just.

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

This _17_ day of March, 2005.


Richard R. Edwards
Alabama State Bar No. ASB-7102-S82R
KILPATRICK STOCKTON LLP
1100 Peachtree Street
Suite 2800
Atlanta, Georgia
30309-4530
Tel:  404-815-6500
Fax:  404-815-6555
raedwards@kilpatrickstockton.com

*Of Counsel*:
Jerre B. Swann
Christopher J. Kellner
KILPATRICK STOCKTON LLP
1100 Peachtree Street
Suite 2800
Atlanta, Georgia
30309-4530
Tel:  404-815-6500
Fax:  404-815-6555
jswann@kilpatrickstockton.com
ckellner@kilpatrickstockton.com

George B. Gordon
Alabama Bar No. ASB-1018-N38G
Office of Counsel
The University of Alabama System
Box 870106
Tuscaloosa, Alabama 35467-0106
Telephone: (205) 348-5490
Fax: (205) 348-8681
E-mail: sgordon@uasystem.ua.edu

17

# EXHIBIT A



## The Interception

Copyright 2000 New Life Art, Inc.

Antonio Langham played a remarkable game in the inaugural SEC Championship against the Florida Gators in 1992, earning him the "Most Valuable Player of the Game" award. In addition to this, he had the standout play of the game when he intercepted a Shane Matthews' pass and returned it for 27 yards and the game-winning touchdown for Alabama. The Tide's 28-21 victory over the Gators was an essential steppingstone in their climb to the 1992 national championship.

# EXHIBIT B

Int. Cls.: 6, 9, 11, 12, 14, 16, 18, 20, 21, 24, 25, 26, 27, 28 and 34

Prior U.S. Cls.: 2, 3, 8, 13, 19, 21, 22, 27, 28, 32, 36, 37, 38,
    39, 40, 41, 42 and 50

**United States Patent and Trademark Office**  Reg. No. 1,351,302

Registered July 30, 1985

## TRADEMARK
### PRINCIPAL REGISTER



BOARD OF TRUSTEES OF THE UNIVERSITY
  OF ALABAMA; THE (ALABAMA CORPORA-
  TION)
P.O. BOX BT
401 QUEEN CITY AVE.
UNIVERSITY, AL 35486

  FOR: KEY RINGS, METAL LICENSE
PLATES, AND LICENSE PLATE FRAMES , IN
CLASS 6 (U.S. CLS. 13 AND 50).
  FIRST USE 0–0–1973; IN COMMERCE
0–0–1973.
  FOR: MEGAPHONES, IN CLASS 9 (U.S. CLS.
21 AND 36).

  FIRST USE 0–0–1973; IN COMMERCE
0–0–1973.
  FOR: COMMODE SEATS, ELECTRICAL
FANS FOR DOMESTIC USE, ELECTRIC
NIGHTLIGHTS, AND LAMPS, IN CLASS 11
(U.S. CLS. 13 AND 21).
  FIRST USE 0–0–1973; IN COMMERCE
0–0–1973.
  FOR: BICYCLES, TRICYCLES, BABY CAR-
RIAGES, AND CAR HORNS, IN CLASS 12 (U.S.
CL. 19).
  FIRST USE 0–0–1973; IN COMMERCE
0–0–1973.

2                                        1,351,302

FOR: GOLD PINS, TIE TACS, NECKLACES, BRACELETS, JEWELRY CHAINS, BROACHES, RINGS, WATCHES, AND CLOCKS, IN CLASS 14 (U.S. CLS. 27 AND 28).

FIRST USE 0–0–1973; IN COMMERCE 0–0–1973.

FOR: BOOKS, NOTEBOOKS, LOOSELEAF BINDERS, WRITING PAPER AND ENVELOPES, DESK PADS, NOTEPAD HOLDERS, LETTER OPENERS, PENCIL CUPS, PLASTIC CONTAINERS FOR PAPER CLIPS, LAP BOARDS FOR HOLDING BOOKS AND PAPER, APPOINTMENT BOOKS, ADDRESS BOOKS, WALL CALENDARS, PROTECTIVE BINDERS FOR DIPLOMAS, PENS, PEN AND PENCIL SETS, BOOK ENDS, DECALS, POSTCARDS, BUMPER STICKERS AND PLAYING CARDS, IN CLASS 16 (U.S. CLS. 22, 32, 37 AND 38).

FIRST USE 0–0–1973; IN COMMERCE 0–0–1973.

FOR: SCHOOL BOOK BAGS, TOTE BAGS, HAND LUGGAGE, BRIEFCASES, ATTACHE CASES, BRIEFCASE TYPE PORTFOLIOS, BACKPACKS, GARMENT BAGS FOR TRAVEL, WALLETS, AND UMBRELLAS, IN CLASS 18 (U.S. CLS. 3 AND 41).

FIRST USE 0–0–1973; IN COMMERCE 0–0–1973.

FOR: PILLOWS, STADIUM CUSHIONS, CHAIRS, CHAIR CUSHIONS, AND DECORATIVE WALL PLAQUES, IN CLASS 20 (U.S. CL. 32).

FIRST USE 0–0–1973; IN COMMERCE 0–0–1973.

FOR: DRINKING MUGS, GLASSES, CUPS, PLATES, VACUUM BOTTLES, PICNIC COOLERS, SOAP DISHES, CERAMIC STATUES, AND WASTEBASKETS, IN CLASS 21 (U.S. CLS. 2 AND 50).

FIRST USE 0–0–1973; IN COMMERCE 0–0–1973.

FOR: TOWELS, BLANKETS, PENNANTS, AND BANNERS, IN CLASS 24 (U.S. CLS. 42 AND 50).

FIRST USE 0–0–1973; IN COMMERCE 0–0–1973.

FOR: SLEEP SHIRTS, ROBES, SHIRTS, T-SHIRTS, TENNIS SHIRTS, LADIES' TOPS, JERSEYS, WARM-UP SUITS, SWEATERS, BLAZERS, JACKETS, VESTS, SHORTS, BABY PANTS, BIBS, TIES, SHOES, MITTENS, SCARVES, SOCKS, CAPS, AND VISORS, IN CLASS 25 (U.S. CL. 39).

FIRST USE 0–0–1973; IN COMMERCE 0–0–1973.

FOR: BELT BUCKLES, BUTTONS FOR CLOTHING, AND CLOTHING PATCHES, IN CLASS 26 (U.S. CL. 40).

FIRST USE 0–0–1973; IN COMMERCE 0–0–1973.

FOR: DOOR MATS, IN CLASS 27 (U.S. CLS. 42 AND 50).

FIRST USE 0–0–1973; IN COMMERCE 0–0–1973.

FOR: RACQUET COVERS, FOOTBALLS, BASKETBALLS, TOY STUFFED ANIMALS, AND TOY FLYING DISCS, IN CLASS 28 (U.S. CL. 22).

FIRST USE 0–0–1973; IN COMMERCE 0–0–1973.

FOR: ASHTRAYS, CIGARETTE LIGHTERS, AND PIPES, IN CLASS 34 (U.S. CL. 8).

FIRST USE 0–0–1973; IN COMMERCE 0–0–1973.

SER. NO. 399,068, FILED 9–30–1982.

EVAN J. KRAME, EXAMINING ATTORNEY

Int. Cl.: 25

Prior U.S. Cl.: 39

## United States Patent and Trademark Office

Reg. No. 1,325,940
Registered Mar. 19, 1985

## TRADEMARK
### Principal Register



The Board of Trustees of The University of Alabama
(Alabama corporation)
P.O. Box BT
401 Queen City Ave.
University, Ala. 35486

For: CAPS, in CLASS 25 (U.S. Cl. 39).
First use 1973; in commerce 1973.
Sec. 2(f) as to "Alabama".

Ser. No. 399,004, filed Sep. 30, 1982.

CYNTHIA B. WHITE, Examining Attorney

Int. Cls.: **6, 9, 11, 14, 16, 18, 20, 21, 24 and 25**

Prior U.S. Cls.: **2, 3, 13, 20, 21, 26, 27, 30, 33, 36, 37, 38, 39, 41 and 42**

Reg. No. **1,322,955**

## United States Patent and Trademark Office

Registered Mar. 5, 1985

## TRADEMARK
### Principal Register



The Board of Trustees of The University of Alabama (Alabama corporation)
P.O. Box BT
401 Queen City Ave.
University, Ala. 35486

For: KEY CHAINS, in CLASS 6 (U.S. Cl. 13).
First use 1973; in commerce 1973.
For: MEGAPHONES AND SUNGLASSES, in CLASS 9 (U.S. Cls. 26 and 36).
First use 1973; in commerce 1973.

For: COMMODE SEATS AND ELECTRIC LAMPS, in CLASS 11 (U.S. Cls. 13 and 21).
First use 1973; in commerce 1973.
For: CLOCKS, in CLASS 14 (U.S. Cl. 27).
First use 1973; in commerce 1973.
For: NOTEBOOKS, NOTEPAD HOLDERS, WALL CALENDARS, PENS, AND DECALS, in CLASS 16 (U.S. Cls. 37 and 38).
First use 1973; in commerce 1973.
For: GARMENT BAGS FOR TRAVEL AND UMBRELLAS, in CLASS 18 (U.S. Cls. 3 and 41).
First use 1973; in commerce 1973.

**2**                                          1,322,955

For: STADIUM CUSHIONS, AND DECORATIVE WALL PLAQUES, in CLASS 20 (U.S. Cl. 20).

First use 1973; in commerce 1973.

For: DRINKING MUGS, GLASSES, AND CUPS, INSULATING SLEEVE-HOLDERS FOR BEVERAGE CANS AND PICNIC COOLERS, in CLASS 21 (U.S. Cls. 2, 30 and 33).

First use 1973; in commerce 1973.

For: BLANKETS AND PENNANTS, in CLASS 24 (U.S. Cl. 42).

First use 1973; in commerce 1973.

For: UNDERSHIRTS, SHIRTS, T-SHIRTS, JERSEYS, SWEAT SHIRTS, SWEAT SUITS, SHORTS, AND CAPS, in CLASS 25 (U.S. Cl. 39).

First use 1973; in commerce 1973.

Ser. No. 399,005, filed Sep. 30, 1982.

CYNTHIA B. WHITE, Examining Attorney

Int. Cls.: 6, 16, 18, 21, 24, 25 and 28

Prior U.S. Cls.: 3, 13, 22, 33, 38, 39, 42 and 50

**United States Patent and Trademark Office**

Reg. No. 1,318,889
Registered Feb. 12, 1985

## TRADEMARK
### Principal Register



The Board of Trustees of the University of Alabama (Alabama corporation)
P.O. Box BT
University, Ala. 35486

For: MONEY CLIPS MADE OF METAL, in CLASS 6 (U.S. Cl. 13).
First use Oct. 13, 1983; in commerce Oct. 13, 1983.
For: DECALS AND BUMPER STICKERS, in CLASS 16 (U.S. Cl. 38).

First use Oct. 13, 1983; in commerce Oct. 13, 1983.
For: TOTE BAGS, in CLASS 18 (U.S. Cl. 3).
First use Oct. 13, 1983; in commerce Oct. 13, 1983.
For: APOTHECARY JARS AND DRINKING GLASSES, in CLASS 21 (U.S. Cl. 33).
First use Oct. 13, 1983; in commerce Oct. 13, 1983.
For: PENNANTS AND BANNERS MADE OF TEXTILE MATERIAL, in CLASS 24 (U.S. Cls. 42 and 50).
First use Oct. 13, 1983; in commerce Oct. 13, 1983.

**2**                                                   1,318,889

For: RUNNING SHOES, SWEAT SHIRTS, GOLF SHIRTS, TENNIS VISORS, SHORTS, SWEAT PANTS, CAPS, NIGHTSHIRTS, PRACTICE SHORTS, JACKETS, AND BASEBALL UNIFORMS EXCLUSIVE OF THE PROTECTIVE ELEMENTS THEREOF, in CLASS 25 (U.S. Cls. 22 and 39).

First use Oct. 13, 1983; in commerce Oct. 13, 1983.

For:    RACQUET    BALLS    AND RACQUETBALL RACKETS, in CLASS 28 (U.S. Cl. 22).

First use Oct. 13, 1983; in commerce Oct. 13, 1983.

The drawing is lined for the colors gray and red, but color is not claimed as a feature of the mark.

Ser. No. 455,257, filed Dec. 2, 1983.

JOSEPH ERVIN, Examiner

# EXHIBIT C

**Int. Cls.: 6, 8, 9, 11, 14, 16, 18, 20, 21, 24, 25, 26, 28 and 34**

**Prior U.S. Cls.: 2, 3, 8, 13, 21, 22, 23, 27, 28, 30, 32, 33, 34, 36, 37, 38, 39, 40, 41, 42 and 50**

**Reg. No. 1,338,772**

# United States Patent and Trademark Office

Registered June 4, 1985

# TRADEMARK
## PRINCIPAL REGISTER

## CRIMSON TIDE

BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA; THE (ALABAMA CORPORATION)
P.O. BOX BT
401 QUEEN CITY AVE.
UNIVERSITY, AL 35486

FOR: KEY RINGS, METAL LICENSE PLATES FOR LAND VEHICLES AND LICENSE PLATE FRAMES, IN CLASS 6 (U.S. CLS. 13 AND 50).

FIRST USE 0–0–1930; IN COMMERCE 0–0–1930.

FOR: POCKET KNIVES, IN CLASS 8 (U.S. CL. 23).

FIRST USE 0–0–1930; IN COMMERCE 0–0–1930.

FOR: MEGAPHONES, IN CLASS 9 (U.S. CL. 36).

FIRST USE 0–0–1930; IN COMMERCE 0–0–1930.

FOR: COMMODE SEATS, ELECTRICAL FANS FOR DOMESTIC USE, ELECTRIC NIGHTLIGHTS AND LAMPS, IN CLASS 11 (U.S. CLS. 13, 21 AND 34).

FIRST USE 0–0–1930; IN COMMERCE 0–0–1930.

FOR: GOLD PINS, NECKLACES, BRACELETS, GOLD EARRINGS, CHAINS, BROACHES, WATCHES, TIE TACS AND CLOCKS, IN CLASS 14 (U.S. CLS. 27 AND 28).

FIRST USE 0–0–1930; IN COMMERCE 0–0–1930.

FOR: NOTEBOOKS, LOOSELEAF BINDERS, WRITING PAPER AND ENVELOPES, DESK PADS, NOTEPAD HOLDERS, LETTER OPENERS, PENCIL CUPS, PLASTIC CONTAINERS FOR PAPER CLIPS, APPOINTMENT BOOKS, ADDRESS BOOKS, WALL CALENDARS, PROTECTIVE BINDERS FOR DIPLOMAS, PENS, PEN AND PENCIL SETS, BOOK ENDS, LAP BOARDS FOR HOLDING BOOKS AND PAPER, DECALS, PICTURE POSTCARDS, BUMPER STICKERS, SCHOOL BOOK BAGS AND PLAYING CARDS, IN CLASS 16 (U.S. CLS. 3, 22, 32, 37 AND 38).

FIRST USE 0–0–1930; IN COMMERCE 0–0–1930.

FOR: TOTE BAGS, HAND LUGGAGE, BRIEFCASES, ATTACHE CASES, BRIEFCASE TYPE PORTFOLIOS, BACKPACKS, GARMENT BAGS FOR TRAVEL, AND UMBRELLAS, IN CLASS 18 (U.S. CLS. 3 AND 41).

FIRST USE 0–0–1930; IN COMMERCE 0–0–1930.

FOR: PILLOWS, STADIUM CUSHIONS, CHAIRS, CHAIR CUSHIONS, DECORATIVE WALL PLAQUES AND ORNAMENTAL NOVELTY BUTTONS, IN CLASS 20 (U.S. CL. 50).

FIRST USE 0–0–1930; IN COMMERCE 0–0–1930.

FOR: DRINKING MUGS, GLASSES, AND CUPS, PLATES, VACUUM BOTTLES, PICNIC COOLERS, BABY BOTTLES, SOAP DISHES, CERAMIC STATUES, AND WASTEBASKETS, IN CLASS 21 (U.S. CLS. 2, 30 AND 33).

FIRST USE 0–0–1930; IN COMMERCE 0–0–1930.

FOR: TOWELS, BLANKETS, PENNANTS, AND BANNERS, IN CLASS 24 (U.S. CL. 42).

FIRST USE 0–0–1930; IN COMMERCE 0–0–1930.

2                                 1,338,772

FOR: UNDERSHIRTS, SLEEP SHIRTS, ROBES, SHIRTS, T-SHIRTS, TENNIS SHIRTS, POLO SHIRTS, LADIES' TOPS, JERSEYS, SWEAT SHIRTS, SWEAT SUITS, WARM-UP SUITS, SWEATERS, BLAZERS, JACKETS, VESTS, SHORTS, BABY PANTS, INFANTS' JUMPERS, BIBS, TIES, SHOES, MITTENS, SCARVES, SOCKS AND CAPS, IN CLASS 25 (U.S. CL. 39).

FIRST USE 0–0–1930; IN COMMERCE 0–0–1953.

FOR: BELT BUCKLES, BUTTONS FOR CLOTHING, CLOTHING PATCHES, AND SHOELACES, IN CLASS 26 (U.S. CL. 40).

FIRST USE 0–0–1930; IN COMMERCE 0–0–1930.

FOR: RACQUET COVERS, FOOTBALLS, TOY STUFFED ANIMALS AND TOY FLYING DISCS, IN CLASS 28 (U.S. CL. 22).

FIRST USE 0–0–1930; IN COMMERCE 0–0–1930.

FOR: ASHTRAYS, CIGARETTE LIGHTERS, AND PIPES, IN CLASS 34 (U.S. CL. 8).

FIRST USE 0–0–1930; IN COMMERCE 0–0–1930.

SER. NO. 399,074, FILED 9–30–1982.

CYNTHIA B. WHITE, EXAMINING ATTORNEY

Int. Cls.: 4, 6, 16, 18, 20, 21, 25, 27, 28 and 34

Prior U.S. Cls.: 2, 3, 8, 13, 14, 15, 20, 22, 25, 28, 32, 33, 37, 38 and 39

# United States Patent and Trademark Office

Reg. No. 1,335,032
Registered May 14, 1985

## TRADEMARK
### PRINCIPAL REGISTER

## ROLL TIDE

BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA; THE (ALABAMA CORPORATION)
P.O. BOX BT
401 QUEEN CITY AVE.
UNIVERSITY, AL 35486

FOR: CANDLES, IN CLASS 4 (U.S. CL. 15).
FIRST USE 0–0–1940; IN COMMERCE 0–0–1940.
FOR: KEY RINGS, METAL LICENSE PLATES FOR LAND VEHICLES, AND LICENSE PLATE FRAMES, IN CLASS 6 (U.S. CLS. 13, 14, 25 AND 28).
FIRST USE 0–0–1940; IN COMMERCE 0–0–1940.
FOR: NOTEBOOKS, LOOSELEAF BINDERS, WRITING PAPER AND ENVELOPES, DESK PADS, NOTEPAD HOLDERS, LETTER OPENERS, PENCIL CUPS, PLASTIC CONTAINERS FOR PAPER CLIPS, APPOINTMENT BOOKS, ADDRESS BOOKS, WALL CALENDARS, PROTECTIVE BINDERS FOR DIPLOMAS, PENS, PEN AND PENCIL SETS, BOOK ENDS, LAP BOARDS FOR HOLDING BOOKS AND PAPER, DECALS, PICTURE POSTCARDS, BUMPER STICKERS, SCHOOL BOOK BAGS AND PLAYING CARDS, IN CLASS 16 (U.S. CLS. 37 AND 38).
FIRST USE 0–0–1940; IN COMMERCE 0–0–1940.
FOR: TOTE BAGS, HAND LUGGAGE BRIEFCASES, ATTACHE CASES, BRIEFCASE TYPE PORTFOLIOS, BACKPACKS, GARMENT BAGS FOR TRAVEL, AND UMBRELLAS, IN CLASS 18 (U.S. CL. 3).

FIRST USE 0–0–1940; IN COMMERCE 0–0–1940.
FOR: PILLOWS, STADIUM CUSHIONS, CHAIRS, CHAIR CUSHIONS, DECORATIVE WALL PLAQUES AND ORNAMENTAL NOVELTY BUTTONS, IN CLASS 20 (U.S. CL. 32).
FIRST USE 0–0–1940; IN COMMERCE 0–0–1940.
FOR: DRINKING MUGS, GLASSES, AND CUPS, PLATES, INSULATING SLEEVE HOLDERS FOR BEVERAGE CANS, VACUUM BOTTLES, PICNIC COOLERS, BABY BOTTLES, SOAP DISHES, CERAMIC STATUES, AND WASTEBASKETS, IN CLASS 21 (U.S. CLS. 2 AND 33).
FIRST USE 0–0–1940; IN COMMERCE 0–0–1940.
FOR: SLEEP SHIRTS, ROBES, SHIRTS, T-SHIRTS, TENNIS SHIRTS, LADIES' TOPS, JERSEYS, WARM-UP SUITS, SWEATERS, BLAZERS, JACKETS, VESTS, SHORTS, BABY PANTS, BIBS, TIES, SHOES, MITTENS, SCARVES, SOCKS, CAPS, AND VISORS, IN CLASS 25 (U.S. CL. 39).
FIRST USE 0–0–1940; IN COMMERCE 0–0–1953.
FOR: DOOR MATS, IN CLASS 27 (U.S. CL. 20).
FIRST USE 0–0–1940; IN COMMERCE 0–0–1940.
FOR: RACQUET COVERS, FOOTBALLS, BASKETBALLS, TOY STUFFED ANIMALS, AND TOY FLYING DISCS, IN CLASS 28 (U.S. CL. 22).
FIRST USE 0–0–1940; IN COMMERCE 0–0–1940.

2                                    1,335,032

FOR: ASHTRAYS, CIGARETTE LIGHTERS, AND PIPES, IN CLASS 34 (U.S. CL. 8).

FIRST USE 0–0–1940; IN COMMERCE 0–0–1940.

SER. NO. 399,073, FILED 9–30–1982.

CYNTHIA B. WHITE, EXAMINING ATTORNEY

# EXHIBIT D

Int. Cls.: 6, 12, 14, 16, 20, 21, 24, 25, 26 and 28

Prior U.S. Cls.: 2, 13, 19, 22, 27, 28, 30, 32, 37, 38, 39, 40, 42 and 50

## United States Patent and Trademark Office

**Reg. No. 1,526,504**
Registered Feb. 28, 1989

## TRADEMARK
### PRINCIPAL REGISTER

## BAMA

BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA, THE (ALABAMA CORPORATION)
401 QUEEN CITY AVE.
P.O. BOX BT
UNIVERSITY, AL 35486

FOR: KEY RINGS, IN CLASS 6 (U.S. CLS. 13 AND 50).

FIRST USE 8-31-1982; IN COMMERCE 8-31-1982.

FOR: BICYCLES, TRICYCLES, BABY CARRIAGES, METAL LICENSE PLATES FOR LAND VEHICLES, AND CAR HORNS, IN CLASS 12 (U.S. CL. 19).

FIRST USE 0-0-1945; IN COMMERCE 0-0-1945.

FOR: GOLD PINS, NECKLACES, BRACELETS, GOLD EARRINGS, CHAINS, BROACHES MADE OF PRECIOUS METAL, TIE TACS, WATCHES, AND CLOCKS, IN CLASS 14 (U.S. CLS. 27 AND 28).

FIRST USE 0-0-1945; IN COMMERCE 0-0-1945.

FOR: NOTEBOOKS, LOOSELEAF BINDERS, WRITING PAPER AND ENVELOPES, DESK PADS, NOTEPAD HOLDERS, LETTER OPENERS, PENCIL CUPS, PLASTIC CONTAINERS FOR PAPER CLIPS, APPOINTMENT BOOKS, ADDRESS BOOKS, CALENDARS, PROTECTIVE BINDERS FOR DIPLOMAS, PENS, PEN AND PENCIL SETS, BOOK ENDS, LAP BOARDS FOR HOLDING BOOKS AND PAPER, SCHOOL BOOK BAGS, DECALS, POSTCARDS, BUMPER STICKERS, AND PLAYING CARDS, IN CLASS 16 (U.S. CLS. 2, 22, 32, 37 AND 38).

FIRST USE 0-0-1945; IN COMMERCE 0-0-1945.

FOR: DECORATIVE WALL PLAQUES, IN CLASS 20 (U.S. CL. 32).

FIRST USE 8-31-1982; IN COMMERCE 8-31-1982.

FOR: CERAMIC STATUES , IN CLASS 21 (U.S. CLS. 30 AND 50).

FIRST USE 8-31-1982; IN COMMERCE 8-31-1982.

FOR: PENNANTS, IN CLASS 24 (U.S. CLS. 42 AND 50).

FIRST USE 0-0-1945; IN COMMERCE 0-0-1945.

FOR: SLEEP SHIRTS, ROBES, SHIRTS, T-SHIRTS, TENNIS SHIRTS, LADIES' TOPS, JERSEYS, SWEAT SHIRTS, SWEAT PANTS, WARM-UP SUITS, SWEATERS, BLAZERS, JACKETS, VESTS, SHORTS, CHILDREN'S CHEERLEADER OUTFITS CONSISTING OF A SKIRT AND TOP; BABY PANTS, INFANTS' JUMPERS, BIBS, TIES, SHOES, MITTENS, SCARVES, SOCKS, AND CAPS, IN CLASS 25 (U.S. CL. 39).

FIRST USE 0-0-1945; IN COMMERCE 0-0-1945.

FOR: LAPEL BUTTONS, LAPEL PINS, BELT BUCKLES, BROACHES MADE OF NON-PRECIOUS METAL, BUTTONS FOR CLOTHING, AND CLOTHING PATCHES, IN CLASS 26 (U.S. CLS. 28 AND 40).

FIRST USE 0-0-1945; IN COMMERCE 0-0-1945.

FOR: TOY STUFFED ANIMALS, IN CLASS 28 (U.S. CL. 22).

2                                    1,526,504

FIRST USE 8–31–1982; IN COMMERCE
8–31–1982.

OWNER OF U.S. REG. NOS. 1,429,820,
1,483,027, AND 1,483,351.

SEC. 2(F).

SER. NO. 399,007, FILED 9–30–1982.

DAVID C. REIHNER, EXAMINING ATTOR-
NEY

# EXHIBIT E

COLLEGIATE LICENSING COMPANY
## LICENSE AGREEMENT TO USE LICENSED INDICIA
### OF MEMBER UNIVERSITIES

RENEWAL

This is an Agreement between **NEW LIFE ART**

a **CORPORATION** organized under the laws of the state of **ALABAMA**, having its principal place of business at **3600 LORNARIDGE DR. BIRMINGHAM, AL 35216** ("Licensee"), and The Collegiate Licensing Company, a Georgia corporation, having its principal place of business at 320 Interstate North, Suite 102, Atlanta, Georgia 30339 ("CLC").

WHEREAS CLC represents licensing interests of various colleges and universities, and has the exclusive rights, as agent, to license for commercial purposes the use of certain indicia.

WHEREAS Licensee desires to be licensed to utilize certain indicia in connection with the manufacture, distribution and sale of certain products, and CLC is willing, subject to certain conditions, to grant such a license.

NOW, THEREFORE, in consideration of the parties' mutual covenants and undertakings, and other good and valuable consideration the receipt and sufficiency of which are acknowledged, the parties agree as follows:

## 1. DEFINITIONS

(a) "Member Universities" means the colleges and universities currently represented by CLC including any additions or deletions as from time to time may be made by CLC.

(b) "Licensed Indicia" means the names, symbols, designs, and colors of the Member Universities, including without limitation, the trademarks, service marks, designs, team names, nicknames, abbreviations, city/state names in the appropriate context, slogans, logographics, mascots, seals and other symbols associated with or referring to the respective Member Universities. Licensed Indicia includes those in Appendix B and indicia adopted, used and approved for use by the Member Universities. Any newly adopted indicia shall be deemed to be additions to the Licensed Indicia in Appendix B and shall be subject to the terms and conditions of the Agreement.

(c) "Licensed Articles" means the products listed in Appendix C and bearing Licensed Indicia.

(d) "Retail Sales" means the sale of Licensed Articles directly to or for retail outlets, mail order, or catalogs, where the Licensed Articles are ultimately sold to consumers. Retail Sales does not include the sale of Licensed Articles as Premiums, which

requires separate agreements executed by CLC with both the manufacturer and user of the Premium.

(e) "Net Sales" means the total gross invoice amounts of the Licensed Articles billed customers or payments received, whichever is greater, including the royalty amount, less lawful quantity discounts actually allowed and taken as such by customers and shown on the invoice, less any credits for returns actually made as supported by credit memoranda issued to customers, and less sales taxes and prepaid transportation charges on Licensed Articles if shipped by Licensee. No deduction shall be made for direct or indirect costs incurred in the manufacturing, selling, advertising (including cooperative and promotional allowances) or distributing the Licensed Articles, nor shall any deduction be made for uncollectible accounts, cash discounts, similar allowances or any other amounts.

(f) "Premium" means any product bearing Licensed Indicia sold or given away for the purposes of increasing the sale, promoting, or publicizing any other product, service or establishment, including incentives for sales force, trade or consumer promotions.

## 2. GRANT OF LICENSE

(a) Grant: CLC grants to Licensee the nonexclusive, nontransferable license to use the Licensed Indicia on the Licensed Articles for Retail Sales in the Territory during the Term. This license applies only to: the Member Universities listed on Appendix A and any changes thereto; the approved use of the Licensed Indicia shown on Appendix B and any changes thereto; and, the approved Licensed Articles described in Appendix C and any changes thereto.

(b) Territory: The Territory is the United States of America, its territories and possessions, the Commonwealth of Puerto Rico, and United States military bases abroad. Licensee shall not distribute or sell Licensed Articles outside the Territory, or to any person or entity that Licensee knows or has reason to know intends or is likely to resell Licensed Articles outside the Territory.

(c) Term: This Agreement shall begin effect on the last date of signature below and shall expire ____6/30/96____, unless terminated sooner or extended in the manner provided in this Agreement.

(d) Renewal: Upon expiration, Licensee shall be considered for renewal of this Agreement. Renewal is at the sole discretion of CLC and Member Universities.

(e) Distribution. In the event Licensee sells or distributes Licensed Articles at a special price directly or indirectly to itself, including without limitation, any subsidiary of Licensee, or to any other person, firm or corporation related in any manner to Licensee or its officers, directors or major stockholders, or to an exclusive distributor, Licensee shall pay royalties with respect to such sales or distribution based upon the Net Sales price generally charged the trade by Licensee.

(f) Limitation on License: This license is subject to the following additional limitations.

(1) Licensee shall not use the Licensed Indicia for any purpose other than upon or in connection with the approved Licensed Articles listed in Appendix C. Any additions to the Licensed Articles and/or new designs shall be submitted in writing to CLC and samples shall be submitted to CLC for prior written approval. Licensee shall, upon request by CLC, immediately recall any unauthorized products or designs from the marketplace, and destroy or submit to CLC at Licensee's expense said products or designs, at CLC's option.

(2) Licensee shall not provide any method of application of Licensed Indicia to any party unless CLC authorizes Licensee to provide said application under the terms of an authorized manufacturer's agreement.

(3) Licensee shall not contract with any party for the production or application of Licensed Indicia by that party ("Manufacturer") without CLC's authorization. In the event that Licensee desires to have a Manufacturer produce one or more Licensed Article, or any component thereof, Licensee shall provide CLC with the name, address, telephone number and name of the principal contact of the proposed Manufacturer. CLC must approve any Manufacturer, and the Manufacturer must execute an authorized manufacturer's or supplier's agreement provided by CLC prior to use of the Licensed Indicia. In addition, Licensee shall take the steps necessary to ensure the following: Manufacturer produces the Licensed Articles only as and when directed by Licensee, which remains fully responsible for ensuring that the Licensed Articles are manufactured in accordance with the terms herein including approval; Manufacturer does not distribute, sell or supply the Licensed Articles to any person or entity other than Licensee; Manufacturer does not delegate in any manner whatsoever its obligations with respect to the Licensed Articles. Licensee's failure to comply with this Paragraph may result in termination of this Agreement and/or confiscation and seizure of Licensed Articles. CLC hereby reserves the right to terminate in its discretion the engagement of any Manufacturer at any time.

(4) Licensee shall not engage in the direct shipment of off-shore manufactured Licensed Articles to distributors, wholesalers, retailers, etc. Licensee must take receipt of Licensed Articles at the applicable U.S. port of entry.

(5) Licensee shall not manufacture, sell, or distribute articles bearing Licensed Indicia as Premiums, for publicity purposes, for fund raising, as giveaways, in combination sales, or for disposal under similar methods of merchandising. Licensee shall not use any of the Licensed Indicia in connection with any sweepstake, lottery, game of chance or any similar promotional or sales program. In the event Licensee desires to use Licensed Articles for acceptable promotional purposes, Licensee shall obtain written approval from CLC.

(6) Licensee is not permitted, without the applicable Member University's prior consent, to promote or market a Licensed Article by means of a direct mailing or any other direct solicitation to a list of alumni, students, parents, athletic contributors, faculty or staff, or other group associated with the Member University, regardless of how Licensee acquires such list.

(7) Licensee recognizes that any person who has collegiate athletic eligibility cannot have his or her name and/or likeness utilized on any commercial product without the express written permission of CLC and/or the Member University. Therefore, in conducting licensed activity under this Agreement, Licensee shall not encourage or participate in any activity that would cause an athlete or a Member University to violate any rule of the National Collegiate Athletic Association (NCAA) or other governing body.

3. PROMOTIONAL PROGRAMS

(a) General: Licensee recognizes that promotional efforts are important to the success of this program and will assist CLC with such promotional efforts by its participation.

(b) Merchandising Directory: CLC plans to produce an annual merchandising directory in which participation by Licensee is encouraged. Licensee will provide all necessary Licensed Articles for display therein upon request of CLC. The display of Licensee's Licensed Articles, and the cost of the development and promotion of the directory and for periodic changes therein, presently contemplated to be annual, shall be agreed upon in advance by CLC and Licensee.

## 4. SELECTION OF MEMBER UNIVERSITIES AND PERFORMANCE GUARANTEE

(a) Selections: Prior to execution of this Agreement, Licensee selected from a list of available Member Universities those Member Universities whose Licensed Indicia Licensee initially desired to use. Appendix A indicates those Member Universities whose Licensed Indicia Licensee is authorized to use on the Licensed Articles listed in Appendix C. Licensee may from time to time request the addition of a Member University to this Agreement as provided in Paragraph 6(d) hereof.

(b) Performance: With respect to each of the Member Universities with which Licensee is licensed, Licensee undertakes to make and maintain adequate arrangements for the broadest feasible distribution of Licensed Articles throughout the Territory, consistent with its current marketing and distribution plans and objectives. Licensee agrees to maintain adequate inventories of Licensed Articles as an essential part of the distribution program.

(c) Licensee shall inform CLC in writing of any complaint regarding the Licensed Articles within ten (10) days of Licensee becoming aware of any complaint.

## 5. NONEXCLUSIVITY

Nothing in this Agreement shall be construed to prevent CLC or any Member University from granting any other licenses for use of the Licensed Indicia.

## 6. MODIFICATION OF APPENDICES

(a) The Member Universities and their royalty charges shown on Appendix A, the Licensed Indicia on Appendix B, the Member University policies including those on Appendix B-1, and the Licensed Articles on Appendix C may be changed by CLC when and if such changes are directed by the Member Universities.

(b) Through periodic advisory bulletins or notices, CLC will give Licensee written official notice of any changes to appendices or policies. CLC shall give Licensee ninety (90) days written notice of any changes in Member University royalty charges. Licensee, upon receipt of the bulletins or notices, is responsible for distributing them promptly to the appropriate party(s) and complying with the modified appendices and policies.

(c) If there is any change to Appendices A, B, B-1, or C, Licensee agrees that its permission to use the affected Licensed Indicia or to manufacture, distribute, or sell the Licensed Articles pursuant to this Agreement

shall cease on the effective date of notice. In such event, those provisions of Paragraph 20 relating to disposal of inventory shall become effective for the affected Licensed Indicia or Licensed Articles unless Licensee obtains written permission from the Member University concerned to continue to use the Licensed Indicia, or to sell the Licensed Articles.

(d) Upon notification by CLC of the addition of a Member University to the CLC program, or at any other time, Licensee may request in writing the addition of a Member University to the Agreement. Any such addition will require an addendum to Appendix A. Such addendum will be fully executed only upon Licensee's completion of product and design approval requirements.

(e) Any unauthorized use by Licensee of any Licensed Indicia of any Member University shall constitute grounds for immediate termination of this Agreement and may result in action against Licensee for trademark infringement and/or unfair competition.

## 7. PAYMENTS

(a) Rate: Licensee agrees that it shall pay to CLC the applicable royalty rate set forth adjacent to the respective Member Universities listed in Appendix A. The royalties paid ("Royalty Payments") shall be based upon Net Sales, as defined in Paragraph 1(e), of all items containing the Licensed Indicia sold during the Term and any renewal, and during any period allowed pursuant to Paragraph 20.

(b) For purposes of determining the Royalty Payments, sales shall be deemed to have been made at the time of invoicing or billing for Licensed Articles or at the time of delivery thereof, whichever comes first.

(c) Royalty Payments shall be (i) paid by Licensee to CLC on all Licensed Articles (including without limitation any seconds, irregulars, etc. distributed by Licensee pursuant to the provisions of Paragraph 14(c) of this Agreement) distributed by Licensee or any of its affiliated, associated or subsidiary companies even if not billed or billed at less than the usual Net Sales price for such Licensed Articles, and (ii) based upon the usual Net Sales price for such Licensed Articles sold to the trade by Licensee.

(d) Advance Payments: Upon execution of this Agreement by Licensee, and upon any renewal hereof, Licensee shall pay CLC, as a nonrefundable payment, the Advance Payments set forth on Appendix A. Upon renewal, the Advance Payments will be prorated, where applicable, as per CLC's written instructions. Licensee may apply the Advance Payments as credits against

3

Royalty Payments due for the specific Member Universities.

(e) Administrative Fee: Upon execution of this Agreement by Licensee, and upon any renewal hereof, Licensee shall pay CLC, as a non-refundable payment, the Administrative Fee set forth on Appendix A.

## 8. MULTIPLE ROYALTIES

CLC recognizes that Licensee may be subject to other license agreements which, together with this Agreement, would subject certain Licensed Articles to one or more additional royalty payments. Royalty Payments required to be paid to CLC for Licensed Articles may be reduced by mutually agreed upon amounts set forth in writing.

## 9. STATEMENT, PAYMENTS AND PENALTIES

(a) On or before the twentieth (20) day of each month, Licensee shall submit to CLC, in a format provided by CLC, full and accurate statements showing the quantity, description, and Net Sales of the Licensed Articles distributed and/or sold during the preceding month, listed (1) by Licensed Article and (2) by Member University, and including any additional information kept in the normal course of business by the Licensee which is appropriate to enable an independent determination of the amount due hereunder with respect to the Licensed Indicia of each Member University. All Royalty Payments then due CLC shall be made simultaneously with the submission of the statements. Such statements shall be submitted whether or not they reflect any sales.

(b) Failure to submit timely or accurate statements and/or Royalty Payments shall result in an additional charge of 1 1/2% per month on any balance unpaid as of the applicable reporting period.

(c) The receipt and/or acceptance by CLC of the statements furnished or Royalty Payments, or the cashing of any royalty checks paid hereunder, shall not preclude CLC from questioning the correctness thereof at any time. In the event that any inconsistencies or mistakes are discovered in such statements or payments, they shall immediately be rectified by the Licensee and the appropriate payment shall be made by the Licensee.

(d) Licensee shall, unless otherwise directed in writing by CLC, send all Royalty Payments and statements to:

The Collegiate Licensing Company
320 Interstate North
Suite 102
Atlanta, Georgia 30339

## 10. EXEMPT AREA

On or around each Member University campus, certain accounts or areas may be exempt from the obligation to pay Royalty Payments for sales made and delivered by Licensee to customers located within the exempt area. Appendix B-1 denotes those exemptions. CLC reserves the right to add to or delete from Appendix B-1, and will notify Licensee of these changes in writing as provided in Paragraph 6(b).

## 11. OWNERSHIP OF LICENSED INDICIA AND PROTECTION OF RIGHTS

(a) Licensee acknowledges that the Member Universities own the Licensed Indicia in Appendix B, as well as any indicia adopted and used or approved for use by the Member Universities, and that each of the Licensed Indicia is valid, and that each Member University has the exclusive right to use each of its Licensed Indicia subject to the revocable license to use the Licensed Indicia. Licensee acknowledges the validity of the state and federal registrations each Member University owns, obtains or acquires for its Licensed Indicia. Licensee shall not, at any time, file any trademark application with the United States Patent and Trademark Office, or with any other governmental entity for the Licensed Indicia, whether or not such Licensed Indicia is identified in Appendix B. Licensee shall not use any of the Licensed Indicia or any similar mark as, or as part of, a trademark, service mark, trade name, fictitious name, company or corporate name anywhere in the world. Any trademark or service mark registration obtained or applied for that contains the Licensed Indicia or any similar mark shall be transferred to the applicable Member University without compensation.

(b) Licensee shall not oppose or seek to cancel or challenge, in any forum, including, but not limited to, the United States Patent and Trademark Office, any application or registration of the Member Universities. Licensee shall not object to, or file any action or lawsuit because of, any use by any of the Member Universities of any Licensed Indicia for any goods or services, whether such use is by the Member Universities directly or through different licensees or authorized users.

(c) Licensee recognizes the great value of the good will associated with the Licensed Indicia and acknowledges that such good will belongs to the Member Universities, and that such Licensed Indicia have secondary meaning. Licensee shall not, during the term of this Agreement or thereafter, attack the property rights of the Member Universities, attack the validity of this Agreement, or use the Licensed Indicia or any similar mark in any manner other than as licensed hereunder.

(d) Licensee agrees to assist CLC in the protection of the several and joint rights of the Member Universities and CLC in and to the Licensed Indicia and shall provide, at reasonable cost to be borne by CLC, any evidence, documents, and testimony concerning the use by Licensee of any one or more of the Licensed Indicia, which CLC may request for use in obtaining, defending, or enforcing rights in any Licensed Indicia or related application or registration. Licensee shall notify CLC in writing of any infringements or imitations by others of the Licensed Indicia of which it is aware. CLC and the applicable Member University shall have the sole right to determine whether or not any action shall be taken on account of any such infringements or imitations. Licensee shall not institute any suit or take any action on account of any such infringements or imitations without first obtaining the written consent of CLC to do so. Licensee agrees that it is not entitled to share in any proceeds received by CLC or any Member University (by settlement or otherwise) in connection with any formal or informal action brought by CLC, Member Universities or other entity.

(e) Nothing in this Agreement gives Licensee any right, title, or interest in any Licensed Indicia except the right to use in accordance with the terms of this Agreement. Licensee's use of any Licensed Indicia inures to the benefit of the respective Member University.

(f) Licensee acknowledges that any original designs, artwork or other compilations or derivatives ("Works") created by it pursuant to this Agreement that contain the Licensed Indicia are compilations or derivatives as those terms are used in Section 103 of the Copyright Act. Therefore, any rights, including copyrights, that Licensee might have in those original Works do not extend to any portion or aspect of the Licensed Indicia or any derivatives thereof, and do not in any way dilute or affect the interests of the Member Universities in the Licensed Indicia or any derivatives thereof. Accordingly, Licensee shall not copy, use, assign or otherwise transfer any rights in any Works with any portion or aspect of the Licensed Indicia or any derivatives thereof included, except in accordance

with this Agreement. Licensee shall not affix a copyright notice to any product bearing a Member University's Licensed Indicia, or otherwise attempt to obtain or assert copyright rights in any artwork or design which contains a Member University's Licensed Indicia, without the express written authorization of CLC.

(g) Licensee acknowledges that its breach or threatened breach of this Agreement will result in immediate and irremediable damage to CLC and/or the Member Universities and that money damages alone would be inadequate to compensate CLC and/or the Member Universities. Therefore, in the event of a breach or threatened breach of this Agreement by Licensee, CLC and/or the Member Universities may, in addition to other remedies, immediately obtain and enforce injunctive relief prohibiting the breach or threatened breach or compelling specific performance. In the event of any breach or threatened breach of this Agreement by Licensee or infringement of any rights of the Member Universities, if CLC employs attorneys or incurs other expenses, Licensee shall reimburse CLC for its reasonable attorney's fees and other expenses.

## 12.   DISPLAY AND APPROVAL OF LICENSED INDICIA

(a) Licensee shall use the Licensed Indicia properly on all Licensed Articles, as well as labels, containers, packages, tags, and displays (collectively "Packaging"), and in all print advertisements and promotional literature, and television and radio commercials (collectively "Advertising"). On all visible Packaging and Advertising, the Licensed Indicia shall be emphasized in relation to surrounding material by using a distinctive type face, color, underlining, or other technique approved by the Member Universities. Any use of any Licensed Indicia shall conform to the requirements as specified in Appendix B. Wherever appropriate, the Licensed Indicia shall be used as a proper adjective, and the common noun for the product shall be used in conjunction with the Licensed Indicia. The proper symbol to identify the Licensed Indicia as a trademark (i.e., the circled "R" symbol if the Licensed Indicia is registered in the United States Patent and Trademark Office or the "TM" symbol if not so registered) shall be placed adjacent to each Licensed Indicia. Except when otherwise expressly authorized in writing by CLC, Licensee shall not use on any one Licensed Article, Packaging or Advertising the Licensed Indicia of more than one Member University.

(b) CLC will provide to Licensee guidance on the proper use of the Licensed Indicia. A true representation or example of any proposed use by Licensee of any of the Licensed Indicia listed, in any

5

visible or audible medium, and all proposed products, Packaging and Advertising containing or referring to any Licensed Indicia, shall be submitted at Licensee's expense to CLC for approval prior to such use. Licensee shall not use any Licensed Indicia in any form or in any material disapproved or not approved by CLC.

(c) Licensee shall display on each Licensed Article or its Packaging and Advertising the trademark and license notices required by CLC's written instructions in effect as of the date of manufacture.

## 13. DISPLAY OF OFFICIAL TAG

(a) Licensee shall, prior to distribution or sale of any Licensed Article, affix to each Licensed Article, its Packaging and Advertising an "Officially Licensed Collegiate Products" tag or label in the form prescribed by CLC ("Official Label"). In addition, Licensee shall affix its name to each Licensed Article, its Packaging and Advertising. It is acceptable for Licensee's name to appear on the Official Label subject to prior approval by CLC. Licensee shall obtain Official Labels from one or more suppliers authorized by CLC to produce those labels or shall manufacture Official Labels in-house subject to prior written approval by CLC.

(b) Licensee is responsible for affixing the Official Label to each Licensed Article, its Packaging and Advertising. Licensee shall not provide Official Labels to any third party for any purpose whatsoever, without prior written approval by CLC.

(c) Licensee agrees to defend, indemnify and hold harmless CLC, the Member Universities, and those Indemnified Parties set forth in Paragraph 17 from all liability claims, costs or damages, including but not limited to any liability for the conversion or wrongful seizure of any of the Licensed Articles not containing the Official Label and Licensee's name as required by this Paragraph. This provision is in addition to and in no way limits Paragraph 17.

## 14. PROCEDURE FOR PRODUCT APPROVAL

(a) Licensee understands and agrees that it is an essential condition of this Agreement to protect the high reputations enjoyed by the Member Universities, and that the products and designs sold, promoted, or advertised in association with any of the Licensed Indicia shall be of high and consistent quality, subject to the approval and continuing supervision and control of CLC and the Member Universities. All products, Packaging and/or designs containing the Licensed Indicia must receive written quality control approval by CLC as provided herein.

(b) The standards, specifications, and characteristics of each Licensed Article to be sold under each of the Licensed Indicia are set out in Appendix C, or in an attachment to Appendix C. Licensee agrees to adhere strictly to the agreed standards, specifications, and characteristics for each Licensed Article sold under each of the Licensed Indicia.

(c) Prior to the manufacture, distribution or sale of any product, Packaging, or design containing the Licensed Indicia, Licensee shall submit to CLC, at Licensee's expense, at least one sample of the product, Packaging and/or design for each Member University and one sample for CLC as it would be produced for sale. If CLC approves in writing the product, Packaging and/or design, the same shall be accepted to serve as an example of quality for that product, Packaging and/or design, and production quantities may be manufactured by Licensee in strict conformity with the approved sample. Licensee shall not depart from the approved quality standards in any material respect without the prior written approval of CLC. Products not meeting those standards, including seconds, irregulars, etc., shall not be sold or distributed under any circumstances without CLC's prior written consent.

(d) Licensee may only use the Licensed Indicia as depicted in Appendix B and approved in the manner set forth herein. Licensee may not modify the Licensed Indicia without the express written approval of CLC. The use of the Licensed Indicia in conjunction with original artwork supplied by the Licensee requires the express written approval of CLC. Licensee may submit sketches of proposed artwork for preliminary approval before submitting finished samples.

(e) At time of renewal, or upon request by CLC at any other time, in addition to any other requirement, Licensee shall submit to CLC such number of each product, Packaging and/or design sold under the Licensed Indicia as may be necessary for CLC to examine and test to assure compliance with the quality and standards for products, Packaging and/or designs approved herein. Each product shall be shipped in its usual container or wrapper, together with all labels, tags, and other materials usually accompanying the product. Licensee shall bear the expense of manufacturing and shipping the required number of products, Packaging and/or designs to the destination(s) designated by CLC.

(f) If CLC notifies Licensee of any defect in any product or Packaging, or of any deviation from the approved use of any of the Licensed Indicia, Licensee shall have fifteen (15) days from the date of notification from CLC to correct every noted defect or deviation. Defective products, Packaging and/or designs in

6

Licensee's inventory shall not be sold or distributed and shall, upon request by CLC, be immediately recalled from the marketplace and destroyed or submitted to CLC, at CLC's option and at Licensee's expense. However, if it is possible to correct all defects in the products, Packaging and/or designs in Licensee's inventory, such products, Packaging or designs may be sold after all defects are corrected. CLC and/or its authorized representatives shall have the right at reasonable times without notice to inspect Licensee's plants, warehouses, storage facilities and operations related to the production of Licensed Articles.

## 15. NO JOINT VENTURE OR ENDORSEMENT OF LICENSEE

Nothing in this Agreement shall be construed to place the parties in the relationship of partners, joint venturers or agents, and Licensee shall have no power to obligate or bind CLC or the Member Universities in any manner whatsoever. Neither CLC nor the Member Universities is in any way a guarantor of the quality of any product produced by Licensee. Licensee shall neither state nor imply, directly or indirectly, that the Licensee or its activities, other than under this license, are supported, endorsed or sponsored by CLC or by any Member University and, upon the direction of CLC, shall issue express disclaimers to that effect.

## 16. INFRINGEMENT

Licensee represents and warrants to CLC that all designs and products submitted for approval are not subject to any valid patent, copyright, trademark or any other proprietary rights of any non-consenting third party. Neither CLC nor any Member University shall be liable as the result of activities by Licensee under this Agreement for infringement of any patent, copyright, trademark or other right belonging to any third party, or for damages or costs involved in any proceeding based upon any such infringement, or for any royalty or obligation incurred by Licensee because of any patent, copyright, trademark or other right held by a third party.

## 17. INDEMNIFICATION AND INSURANCE

(a) Licensee is solely responsible for, and will defend, indemnify and hold harmless CLC, the Member Universities, and their respective officers, agents, and employees (collectively "Indemnified Parties") from any claims, demands, causes of action or damages, including reasonable attorney's fees, arising out of (i) any unauthorized use of or infringement of any patent, copyright, trademark or other proprietary right by Licensee in connection with the designs and Licensed Articles covered by this Agreement, (ii) alleged defects

or deficiencies in said Licensed Articles or the use thereof, or false advertising, fraud, misrepresentation or other claims related to the Licensed Articles not involving a claim of right to the Licensed Indicia, (iii) the unauthorized use of the Licensed Indicia or any breach by Licensee of this Agreement, (iv) libel or slander against, or invasion of the right of privacy, publicity or property of, or violation or misappropriation of any other right of any third party, and/or (v) agreements or alleged agreements made or entered into by Licensee to effectuate the terms of this Agreement. The indemnifications hereunder shall survive the expiration or termination of this Agreement.

(b) Prior to the first sale of any Licensed Article, Licensee shall obtain, and thereafter maintain, Commercial General Liability insurance, including product and contractual liability insurance, providing adequate protection for the Indemnified Parties as additional insured parties on Licensee's policy against any claims, demands, or causes of action and damages, including reasonable attorney's fees, arising out of any of the circumstances described in Paragraph 17(a) above. Such insurance policy shall not be canceled or materially changed in form without at least thirty (30) days written notice to CLC. CLC shall be furnished with a certificate of such insurance and endorsements in the form prescribed by CLC. Licensee agrees that such insurance policy or policies shall provide coverage of one million dollars ($1,000,000) for personal and advertising injury, bodily injury and property damage arising out of each occurrence, or Licensee's standard insurance policy limits, whichever is greater. However, recognizing that the aforesaid amounts may be inappropriate with regard to specific classes of goods, it is contemplated that CLC may make reasonable adjustment to the foregoing amounts. Any adjustment must be confirmed in writing by CLC.

## 18. RECORDS AND RIGHT TO AUDIT

(a) Licensee shall keep, maintain and preserve in its principal place of business during the Term, any renewal periods and at least three (3) years following termination or expiration, complete and accurate books, accounts, records and other materials covering all transactions related to this Agreement in a manner such that the information contained in the statements referred to in Paragraph 9 can be readily determined including, without limitation, customer records, invoices, correspondence and banking, financial and other records in Licensee's possession or under its control. CLC and/or its duly authorized representatives shall have the right to inspect and audit all materials related to this Agreement regarding all Member Universities represented by CLC, which right to inspect and audit shall include the conduct of normal audit tests of

additional Licensee records including those covering "non-licensed" sales to verify that they are not sales covered by this Agreement. In addition to the materials required by normal accounting practices, Licensee must retain detail of CLC licensed sales to the invoice number level for audit purposes, and invoices must indicate the Member University name beside each Licensed Article.

(b)   Such materials shall be available for inspection and audit (including photocopying) at any time during the Term, any renewal periods and at least three (3) years following termination or expiration during reasonable business hours and upon at least five (5) days notice by CLC and/or its representatives. Licensee will cooperate and will not cause or permit any interference with CLC and/or its representatives in the performance of their duties of inspection and audit. CLC and/or its representatives shall have free and full access to said materials for inspection and audit purposes.

(c)   Following the conduct of the audit, Licensee shall take immediate steps to timely resolve all issues raised therein, including payment of any monies owing and due. Should an audit indicate an underpayment of 10% or more or an underpayment of $20,000 or more of the royalties due CLC, the cost of the audit shall be paid by Licensee. Payment of the audit cost is in addition to the full amount of any underpayment including interest as provided in Paragraph 9(b), to be paid by Licensee. Licensee must cure any contract breaches discovered during the audit, provide amended reports if required, and submit the amount of any underpayment including interest and, if applicable, the cost of the audit within thirty (30) days from the date of the conduct of the audit.

## 19. TERMINATION

(a)   CLC shall have the right to terminate this Agreement without prejudice to any other rights it may have, whether under the provisions of this Agreement, in law, in equity or otherwise, upon written notice to Licensee at any time should any of the following defaults occur:

(1)   Licensee does not begin the bona fide manufacture, distribution, and sale of Licensed Articles within one (1) month of the date of this Agreement.

(2)   Licensee fails to continue the bona fide manufacture, distribution, and sale of Licensed Articles during the Term. If, during any calendar quarter of the Term, Licensee fails to sell any of the Licensed Articles or fails to sell any Licensed Articles

for a particular Member University, CLC may terminate this Agreement with respect to said Licensed Article or Member University by giving written notice.

(3)   Licensee fails to make any payment due or fails to deliver any required statement, and fails to cure this default within fifteen (15) days from receipt of notice from CLC.

(4)   The amounts stated in the periodic statements furnished pursuant to Paragraph 9 are significantly or consistently understated.

(5)   Licensee fails to generate royalties during the initial Term or any renewal period that meet or exceed the amount of the Advance Payment amounts as provided in Paragraph 7(d) and Appendix A.

(6)   Licensee fails to resolve any issue raised in connection with any audit.

(7)   Licensee fails to pay its liabilities when due, or makes any assignment for the benefit of creditors, or files any petition under any federal or state bankruptcy statute, or is adjudicated bankrupt or insolvent, or if any receiver is appointed for its business or property, or if any trustee in bankruptcy shall be appointed under the laws of the United States government or the several states.

(8)   Licensee attempts to grant or grants a sublicense or attempts to assign or assigns any right or duty under this Agreement to any person or entity without the prior written consent of CLC.

(9)   Licensee or any related entity manufactures, distributes or sells any product infringing or diluting the trademark, property or any other right of any Member University or any other party.

(10)   Licensee fails to deliver to CLC or maintain in full force and effect the insurance referred to in Paragraph 17(b).

(11)   Any governmental agency or court of competent jurisdiction finds that the Licensed Articles are defective in any way, manner or form.

(12)   Licensee discontinues its business as it is now conducted.

(13)   Licensee commits any act or omission reflecting unfavorably, embarrassing or otherwise detracting from the high reputation of any Member University.

(14) Licensee manufactures, distributes or sells Licensed Articles of quality lower than the samples approved, or manufactures, distributes, sells or uses Licensed Articles or Licensed Indicia in a manner not approved or disapproved by CLC, and fails to cure this default within fifteen (15) days from receipt of notice from CLC.

(15) Licensee breaches any provision in this Agreement, and fails to cure this default within fifteen (15) days from receipt of notice from CLC.

(16) Licensee fails to affix to each Licensed Article, its Packaging and Advertising an Official Label and Licensee name in the manner provided in Paragraph 13, and fails to cure this default within fifteen (15) days from receipt of notice from CLC.

(b) CLC shall have the right to terminate this Agreement upon written notice to Licensee at the conclusion of the initial Term or of any renewal period without cause with respect to a particular Member University in the event that said Member University directs CLC to terminate this Agreement. This termination shall be without prejudice to any other rights CLC may have, whether under the provisions of this Agreement, in law, in equity or otherwise.

(c) The entire unpaid balance of all Royalty Payments owing and due under this Agreement shall immediately become due and payable upon termination.

## 20. EFFECT OF EXPIRATION OR TERMINATION / DISPOSAL OF INVENTORY

(a) Effect of Expiration or Termination: After expiration or termination of this Agreement for any reason, Licensee shall refrain from further use of any of the Licensed Indicia or any similar mark, including any geographic reference or depiction, directly or indirectly, or any derivation of the Licensed Indicia or a similar mark, except as provided in Paragraph 20(b), or unless expressly authorized by a Member University. Until payment to CLC of any monies due it, CLC shall have a lien on any units of Licensed Articles not then disposed of by Licensee and on any monies due Licensee from any jobber, wholesaler, distributor, or other third parties with respect to sales of Licensed Articles.

(b) Disposal of Inventory: After expiration or termination of this Agreement, Licensee shall have no further right to manufacture Licensed Articles or other products utilizing the Licensed Indicia, but may continue to distribute its remaining inventory of Licensed Articles in existence at the time of expiration or termination for a period of sixty (60) days, provided all statements (including Final Statement) and

payments then due have been delivered and that during the disposal period Licensee delivers all statements and payments due in accordance with Paragraph 9 and complies with all other terms and conditions of this Agreement. Notwithstanding the foregoing, Licensee shall not manufacture, sell or distribute any Licensed Articles after the expiration or termination of this Agreement because of: (a) departure of Licensee from the quality and style approved by CLC under this Agreement; (b) failure of Licensee to obtain product or design approval; or, (c) a default under Paragraph 19.

## 21. FINAL STATEMENT

Thirty (30) days before the expiration of this Agreement, Licensee shall furnish to CLC a statement showing the number and description of Licensed Articles on hand or in process. If this license is terminated for any reason, such statement shall be furnished within fifteen (15) days after notice of termination. CLC reserves the right to conduct physical inventories to ascertain or verify the amount of remaining inventory.

## 22. SURVIVAL OF RIGHTS

(a) The terms and conditions of this Agreement necessary to protect the rights and interests of the Member Universities in their Licensed Indicia including, but not limited to, Licensee's obligations under Paragraph 17, shall survive the termination or expiration of this Agreement.

(b) The terms and conditions of this Agreement requiring Licensee to furnish CLC with reports, statements, or accounts and payment of monies due to CLC, and providing CLC with the right to examine and make copies of Licensee's books and records to determine or verify the correctness and accuracy of Licensee's reports, statements, accounts or payments shall survive the termination or expiration of this Agreement.

(c) The terms and conditions of this Agreement providing for any activity following the effective date of termination or expiration of this Agreement shall survive until such time as those terms and conditions have been fulfilled or satisfied.

## 23. NOTICES

All notices and statements to be given and all payments to be made, shall be given or made to the parties at their respective addresses set forth herein, unless notification of a change of address is given in writing. Any notice shall be sent by first class mail, or by

9

mailgram, telex, TWX, telegram, any nationally recognized overnight delivery service or by telecopy, and shall be deemed to have been given at the time it is mailed or sent.

## 24. CONFORMITY TO LAW AND POLICY

(a) Licensee shall comply with such guidelines, policies, and/or requirements as CLC may announce from time to time, including without limitation guidelines, policies and/or requirements contained in periodic CLC bulletins. Licensee shall comply with all laws, regulations and standards relating or pertaining to the manufacture, sale, advertising or use of the Licensed Articles and shall maintain the highest quality and standards. Licensee shall comply with the requirements of any regulatory agencies (including without limitation the United States Consumer Product Safety Commission) which shall have jurisdiction over the Licensed Articles.

(b) Licensee undertakes and agrees to obtain and maintain all required permits and licenses at Licensee's expense.

(c) Licensee shall pay all federal, state and local taxes due on or by reason of the manufacture, distribution or sale of any Licensed Articles.

## 25. SEVERABILITY

The determination that any provision of this Agreement is invalid or unenforceable shall not invalidate this Agreement, and the remainder of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

## 26. NON-ASSIGNABILITY

This Agreement is personal to Licensee, and Licensee shall not sublicense or franchise any of its rights. Neither this Agreement nor any of Licensee's rights shall be sold, transferred or assigned by Licensee without CLC's prior written approval, and no rights shall devolve by operation of law or otherwise upon any assignee, receiver, liquidator, trustee or other party. Subject to the foregoing, this Agreement shall be binding upon any approved assignee or successor of Licensee and shall inure to the benefit of CLC, its successors and assigns.

## 27. NO WAIVER, MODIFICATION, ETC.

This Agreement, including appendices, constitutes the entire agreement and understanding between the parties and cancels, terminates, and supersedes any prior agreement or understanding relating to the subject

matter hereof between Licensee, CLC and Member Universities. There are no representations, promises, agreements, warranties, covenants or understandings other than those contained herein. None of the provisions of this Agreement may be waived or modified, except expressly in writing signed by both parties. However, failure of either party to require the performance of any term in this Agreement or the waiver by either party of any breach shall not prevent subsequent enforcement of such term nor be deemed a waiver of any subsequent breach.

## 28. MISCELLANEOUS

When necessary for appropriate meaning, a plural shall be deemed to be the singular and singular shall be deemed to be the plural. The attached appendices are an integral part of this Agreement. Paragraph headings are for convenience only and shall not add to or detract from any of the terms or provisions of this Agreement. This Agreement shall be construed in accordance with the laws of the state of Georgia, which shall be the sole jurisdiction for any disputes. This Agreement shall not be binding on CLC until signed by an officer of CLC.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement.

LICENSEE    NEW LIFE ART

By: _Daniel Moore_____

(Signature of officer, partner, or individual duly authorized to sign)

Title: _PRES._____

Date: _6/19/95_____

THE COLLEGIATE LICENSING COMPANY

By: _____

(Signature of President or officer duly authorized to sign)

Title: _VP_____

Date: _6/24/95_____

10

## Appendix A

**New Life Art Inc.**

| University Name | City/State | Rate | Advance Category B |
|---|---|---|---|
| The U of Alabama | Tuscaloosa, AL | 7.50 | $0.00 |
| Auburn U | Auburn, AL | 7.50 | $0.00 |

**CLC Administrative Fee Due**        $0.00

**Total Due CLC**        $0.00

APPENDIX C

NEW LIFE ART INC.

  12. PUBLISHING

      B. CALENDARS                                    AS OF  11/90