## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

**UNIVERSITY OF ALABAMA BOARD
OF TRUSTEES**

        **Plaintiff,**

**v.**                                      **CV 05-UNAS-PT-585-W**

**NEW LIFE ART INC., et al**

        **Defendants.**

### MEMORANDUM OPINION

This cause comes on to be heard on Counter-Claimants' Motion for Summary Judgment on Request for Declaratory Judgment filed by counter-claimants, Daniel A. Moore and New Life Art, Inc., (Doc. #253) and Defendants' Daniel A. Moore and New Life Art, Inc., Motion for Summary Judgment on Plaintiff's Claims (Doc. # 256) filed on September 14, 2009, and Plaintiff's Motion for Summary Judgment (Doc. # 259) filed on September 15, 2009. The parties have agreed that this court is a way station on the route to appellate court(s). There are a plethora of issues for courts to disentangle.

We start with the purported trademark interest of the plaintiff which it seeks to protect. That interest is an alleged unregistered trademark based on a theory of trade dress which is predominantly a color. The existence of and entitlement to protection of this alleged trademark are the pivotal and initially critical issues in the case. It is the court's intention to first decide portions of motions related to claim(s) and (defense(s) pertinent to these issues and certify those rulings pursuant to Fed. Rule of Civ. Proc. 54(b). It would make little sense for the court to try

1

all the claims and defenses without these issues first being decided by controlling authority.[1] Both sides argue that these claims and defenses are ripe for summary judgment, one way or the other. The court has not attempted to list all the places where the parties have argued that there is no genuine issue of material facts. This case has a too long a history of aborted attempts at mediation, special master, new judges, etc. It would be foolish to try the case and then have basic issues of law overturned.

### Pertinent Facts and
### Discussion of Claim(s)[2]

The defendant Daniel Moore (Moore) is a highly qualified and well known sports artist who has painted a number of artistic presentations of notable University of Alabama football plays. The defendant New Life Art, Inc. (New Life) is the corporation which governs Moore's business. Moore's paintings have had highly successful sales, mostly to University of Alabama fans, and the sales have been profitable to both sides of this case. The plaintiff fully acknowledges that Moore's work is of superior quality. Moore's first successful such painting was in 1979. It was not licensed by the plaintiff, but has benefitted both sides and led to other successful sales of other paintings beneficial to both sides. The relationship between the parties remained pleasant and amicable throughout the early years.

The first licensing agreements between the parties came in 1991,[3] and this licensing

---

[1] It is highly unlikely that this case can ever be settled without these pivotal issues being finally decided.

[2] The court has been inundated (some self-imposed) with numbers of briefs, evidentiary submissions, exhibits, etc. It will not attempt to recount every detail. If there is an appeal, the parties can expand on what the court states as pertinent. The file should indicate why this court cannot possibly fully discuss all the detail related to this case.

[3] The plaintiff began licensing in 1981, but did not start licensing defendants until 1991.

2

continued until 2000. Sometime before the termination of the last agreement, the dispute which
led to this lawsuit and the issues which this court is now addressing began. The defendants took
the position that Moore's paintings (referred to as "images") and prints, as distinguished from
"Indicia," did not have to be licensed. The plaintiff took the position that the uniforms worn by
its football players in its colors were trade dress on which it had a protectable trademark and that
the defendants cannot portray and sell football scenes which include those uniforms without a
license to do so. Thus the initial main dispute became and is: Do defendants infringe on
plaintiff's trademark if they create and sell paintings and prints which include as part of their
depictions the uniforms of University of Alabama football players? The defendants do not claim
that they have the present right to depict anywhere on their paintings or prints the "Indicia" which
are specifically pictured and shown as "Indicia" in the license agreements.[4]

Plaintiff argues that the following sample language in the various agreements causes the
uniforms to be "Indicia" although the uniforms are not shown on the various exhibits: "'Licensed
Indicia' means the names, symbols, designs, and colors of the Member Universities ... ."
Various license agreements include as part of exhibits the following: "The University of
Alabama is the owner of all rights, title and interest in and to the following Indicia which
includes trademarks service marks, trade names, designs, logos, seals and symbols." Beneath
this language on some, if not all, exhibits there are *shown* pictured images of various logos, seals,
symbols, etc. Above these images is also a listing of "Verbiages" and "Colors: Crimson PMS
201 Gray PMS 429." This court is of the opinion that the reasonable inference is that the

_____

[4]See Exhibit B to an agreement dated October 17, 1991, Exhibit A to an agreement dated January 27, 1993,
Exhibit A to an agreement dated November 1993, Exhibit A to a license dated June 15, 1994, Exhibit A to a license
dated Dec-Jan. 1994-1995, etc.

3

"Colors" relate to the *shown* images and not to some universal depiction of colors. This inference is supported by the fact that beneath the pictured images there is the following statement: "In addition to the Indicia *shown above*, any Indicia adopted hereafter and used or approved for use by the University shall be deemed to be additions to the Indicia as though *shown above* and shall be subject to the terms and conditions of the Agreement." (Emphasis added.) See attached Exhibits 1, 2, 3 and 4. Uniforms are not pictured or *shown* on any exhibit to any agreement.

If the uniforms are to be considered trade dress marks, there is no reasonable inference that it results from language in the license agreements.[5] In addition to the foregoing, the following language in the agreements suggests that the argument that the "Indicia" term of the agreements includes the uniforms is a late blooming stretch.

> "'Prints' means the fine art limited addition prints listed in Appendix C attached hereto and *bearing* Indicia." (Emphasis added.)
>
> . . . . .
>
> "No license is granted hereunder for the use of Indicia for any purpose other than *upon or in connection with the Prints* named and specified in Appendix C." (Emphasis added.)[6]
>
> . . . . .
>
> "NLA agrees to assist in the protection of the several and joint rights of the University and CM in and to the Indicia. NLA acknowledges that any rights, including copyright or other proprietary rights that it might have in artwork or designs *created by it*, pursuant to this Agreement, extend only to those elements of the artwork or designs

---

[5] If the parties intended that agreements already applied to the quality paintings and prints, a question might be reasonably asked as to why the dispute arose in 1999 or 2000.

[6] Distinguishing "Prints" and "Indicia."

4

which are not part of or included in the Indicia or any derivatives."[7] (Emphasis added.)

. . . . .

"The proper symbol to identify the Indicia as a trademark, (viz, the circle 'A' symbol is registered in the United States Patent and Trademark Office or the 'TM' symbol if not so registered shall be placed next to the Indicia.[8]

. . . . .

After expiration or termination of this Agreement, NLA shall have no further right to manufacture, distribute, sell or otherwise deal in any Prints or other products *which utilize the Indicia* except as hereinafter provided." (Emphasis added.)[9]

. . . . .

"Whereas licensee desires to be licensed to utilize certain Indicia *in connection with* the manufacture, distribution and sale of certain products, and CLC is willing, subject to certain conditions, to grant such a license." (Emphasis added.)

. . . . .

"'Licensed Articles' means *the products* listed in Appendix C and *bearing* licensed Indicia." (Emphasis added.)

. . . . .

"Licensee shall not provide any *method of application* of licensed Indicia to any party unless CLC authorizes licensee to provide said application under the terms of an authorized manufacturer's agreement."[10] (Emphasis added.)

---

[7]It is difficult to imagine how the created "elements of the artwork or designs" could not be a part of the "artwork or designs." It is apparent that the pictured and "*shown*"symbols in the various agreement exhibits are the intended "Indicia." This is notwithstanding the various references to the "colors" of these "Indicia."

[8]Does this realistically apply to uniforms?

[9]Again, a distinction between the "Prints" and the "Indicia."

[10] "Application" of a painting of uniforms?

There may be other such provisions which distinguish "Indicia" from paintings and prints.

Plaintiff's Positions

The following is a partial summary of the plaintiff's positions as stated in its briefs filed on August 8, 2006 and in 2009, along with the court's comments..

(1) The defendants "have violated the Lanham Act in connection with their sale of products bearing University trade dress "Indicia," specifically, the University's distinctive crimson and white colors and football team uniforms." The court does not agree that they are inherently distinctive.[11] They may have gained secondary meaning in some quarters.[12]

(2) The case is partially controlled by *University of Ga. Athletic Ass'n. v. Laite*, 756 F.2d 1535 (11th Cir. 1985); *Boston Prof. Hockey Ass'n v. Dallas Corp & Emblem Mfg., Inc.*, 520 F.2d 1001 (5th Cir. 1975); and *Board of Supervisors of LSU. v. Smack Apparel Co.*, __F.3d __ (5th Cir.   ). This court agrees only to the extent that the cases involve non-artistic products such as T-shirts, mugs, etc. As to those type products, the court will grant plaintiff's motion. *Laite* also involves indicia, a bulldog, of the type pictured and *shown* in some exhibits of the licensing agreements involved in this case, not just colors; and neither is fine art involved.

(3) The trade dress "has secondary meaning and is a strong mark." This court agrees that it has some limited secondary meaning, but not that it is a *strong* mark.

(4) "The University's trade dress attracts the attention of University fans and triggers the

---

[11]Being somewhat memorable does not necessarily equate with being distinctive. By law they are not "inherently "distinctive. *See Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205 (2000). If they have secondary meaning, they become distinctive of a non-inherent sort. *Id.* It is highly questionable as to whether "in the minds of the public, the primary significance of [the uniforms] is to identify the source of the product rather than the product itself." *Id.*

[12]See later discussion of other users.

6

sale of Moore's products." The court is of the opinion that the plays and Moore's reputation established during a period when his art was agreeably not licensed are what predominantly trigger the sales.[13]

(5) The paintings are not transformative. The court is of the opinion that they are transformative to the extent that they memorialize a football play in a fashion that it can be relished and preserved. The plaintiff has repeatedly complimented the work. If transformation means that it changes history or gives a different meaning to the play, other than significantly highlighting it, it may not be transformative. [14] The well known painting of Washington crossing the Delaware may transform a mere description of people rowing in a boat. Plaintiff says that, "Experts for both Moore and the University agree Moore's work captures the most important elements of the game for the fan"and the "overall tone or mood of the environment." In a response filed on October 9, 2009, the plaintiff states:

> Regardless of that evidentiary issue, a dispute over transformation does not impede this Court from deciding the motions for summary judgment because the courts which have used the transformative or similar tests have resolved the issue as a matter of law. *See ETW Corp. v. Jereh Publishing, Inc.*, 332 F.3d 915 (6th Cir. 2003) (resolving balance between right of publicity and First Amendment as a matter of law); *Rogers v. Grimaldi*, 875 F.2d 994 (2nd Cir. 1989) (resolving balance between trademark rights and First Amendment as a matter of law); *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658 (5th Cir. 2000) (same); *Anheiser-Busch, Inc. v. Balducci Publ'n,* 28 F.3d 769 (8th Cir. 1994) (same).

(6) Plaintiff states that the crimson-white color scheme is "unique and distinctive," but

---

[13]Perhaps some loyalty to the University's team, but not the trade dress as such.

[14]In the October 25, 2009 Birmingham News, a columnist referred to an Alabama blocked Tennessee field goal attempt in the previous day's game as a "Daniel Moore moment." That may suggest that his paintings are transformative. It may further suggest what motivates some purchasers of his paintings are his own distinctive mark which also has secondary meaning, not crimson uniforms as such.

also notes that there have been references concerning the team to "Thin Red Line," "Red Elephants," and "Redwood Forest." Crimson is a variation of red colors used by many teams.

(7) "Nothing about the color scheme serves a functional purpose." As indicated by attached Exhibit 6, the first use of crimson by Harvard was "so that spectators could differentiate Harvard's crew team from other teams during a regatta in 1858."[15]

(8) The plaintiff repeatedly emphasizes the reality of Moore's paintings as if it is a further indication of infringement. That reality is what adds strength to the degree of the artistry, distinction and secondary meanings of his paintings.

(9) Plaintiff substantially relies upon a survey to establish likelihood of confusion. The court is of the opinion that the survey lacks strength because of its manner of taking, the form of the questions, the nature of the surveyed customers, and the number of relied upon responders. It involved only one print. The questions are loaded with suggestions that there is a "sponsor" other than the artist.

The court suggests a full reading of the "Notice of Filing [of] Survey Questions" filed on October 27, 2009. The questions and answers create a reasonable inference that the likelihood of confusion may be with the survey. The court has not prepared a compilation of the categories of answers but there is certainly no overwhelming indication of sponsorship by the plaintiff. The names of Moore and New Life and a familiarity with them is somewhat overwhelming. Apparently, any time the University of Alabama is mentioned in a response, it was considered to be the sponsor. The court also notes the emphasis placed in the answers on the fact that Moore's and New Life's names are prominent on paintings. Just as an example, Response Codes 1101-

---

[15]One is reminded of YMCA shirt and skin basketball games.

1171 answer either Daniel Moore, New Life or both except 1110 and 1169 which say "no idea." This type sequence is somewhat repeated throughout. At one point, the question changes from "Who do you believe is sponsoring or promoting the art work ..." to "*Who else*, if anyone, do you believe is sponsoring or promoting the art work ... ?"

(10) The court does not agree that the uniforms of a variation of the color red are inherently distinctive and non-functional. As stated, they may have limited secondary meaning in the region and, thus, become somewhat distinctive. The plaintiff argues that the term "Indicia" used in the various license agreements includes football uniforms because of their colors. The plaintiff further argues that the license agreements and controlling law require that after the termination of the license agreements, the defendants cannot paint and sell play scenes which include the uniforms of University of Alabama football players without infringing on plaintiff's trademark. This court disagrees with both premises. In various exhibits to the license agreements, various "Indicia" are clearly pictured. None of the pictured "Indicia" include football uniforms. As earlier indicated, the agreements state, "In addition to the Indicia *shown above*, any Indicia adopted hereafter and used or approved for use by the University of Alabama shall be deemed to be additions to the Indicia as though *shown above.*"

(11) The plaintiff relies on estoppel resulting from references to "Indicia" in licensing agreements. For reasons herein stated, the court does not agree that there is any such estoppel.

(12) The court does not agree that likelihood of confusion exists as a matter of law because the defendants have continued to use marks after termination of the license agreement. Among other reasons which are elsewhere discussed, the court is of the opinion that the cases relied upon by the plaintiff are distinguishable. These include *Bunn-O-Matic Corp. V. Bunn*

9

*Coffee Serv., Inc.*, 88 F.Supp. 2d. 914 (CD Ill. 2000); *Burger King v. Mason*, 710 F.2d 1480

(11th Cir. 1983); and *Professional Golfers Ass'n of America v. Bankers Life & Cas. Co.*, 514

F.2d 665 (5th Cir. 1975). These cases involve the continued use of the same written name

trademarks, full franchise agreements and a deceit not present here.

Plaintiff also relies on *Ansheuser-Busch, Inc. v. Balducci Publ'n*, 28 F.3d 769 (8th Cir.

1994). It should be noted that the court stated that:

> (1) Anheuser-Busch possessed *several very strong* trademarks
> [conceded by Balducci] displayed virtually unaltered in the ad
> parody." *Id.* at 774.
>
> . . . . .
>
> "Moreover, Balducci published the parody on the back cover of a
> magazine-a location frequently devoted to real ads, even in *Snicker*.
> [Balducci's own magazine]." *Id.* at 774.
>
> . . . . .
>
> "Balducci carefully designed the fictitious ad to appear as authentic
> as possible. Several of *Anheuser-Busch*'s marks were used with little
> or no alteration." *Id.* at 774.
>
> . . . . .
>
> "Balducci even included a ® symbol after the words Michelob Oily."
> *Id.* at 774.
>
> . . . . .
>
> "We do not hold that Balducci's extensive borrowing of Anheuser-
> Busch's trademarks amounts to a per se trademark violation." *Id.* at
> 777.[16]

It is likely that people who buy the Moore paintings do so, at least partially, because of

---

[16]It should also be noted that Balducci's ad was highly negative, suggesting that the plaintiff's products
were tainted with oil.

their loyalty to the University of Alabama and its football teams. That, however, does not create

any reasonable inference that they do so because of confusion based on the color of the uniforms.

Plaintiff cites *Ambrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1542 (11th Cir. 1986). That court stated:

> Kraft's intent in adopting the Polar B'ar trade dress is a critical
> factor ....
>     Kraft chose to name its new product "Polar B'ar", a name
> that conveys a double meaning: 'polar bear' and 'cold bar.'" At the
> time it chose the name, Kraft was aware that the Klondike wrapper
> featured a polar bear.[17]

Moore's intent was to paint interesting plays. A number of the cases cited by the plaintiff

involve confusion resulting from the confusion of names of competitors in the same general

business.

## Likelihood of Confusion

Plaintiff argues that there is likelihood of confusion as to whether plaintiff sponsors the

paintings of the defendants. In this regard, the court is directed by *Frehling Enterprises, Inc. v.

International Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999) to consider:

(1) The type of mark used by the plaintiff;

(2) The similarity of the marks;

(3) The similarity of the goods or services represented by the marks;

(4) The similarity of the retail outlets and the customers served;

(5) The similarity of the advertising media used by the parties;

(6) Whether the defendant had the intent to infringe; and

(7) Any evidence of actual confusion.

---

[17]The court cannot address all the distinguishing features of all the cases cited by either party. However, the purported generality of certain language is often over-emphasized.

The court will address each of the foregoing in the numbered order.

(1) The marks here concerned are the uniforms and their colors. These "marks" do not lend themselves to TM type designations; nor would the general public usually consider them to be "marks." They are descriptive at best and are not inherently distinctive. The following Division 1-A football teams have crimson as part of their colors: Indiana, Kansas, New Mexico State, Oklahoma, Southern Methodist, Utah, Washington State, Cornell and Harvard. Cornell has been known as "Big Red" for many years. New Mexico State, Utah and Harvard all have crimson and white colors. Other teams with variations of red include Arizona, Arkansas, Arkansas State, Ball State, Fresno State, Georgia, Houston, Iowa State, Miami of Ohio, Mississippi, Nebraska, North Carolina State, Northern Illinois, Ohio State, Rutgers, San Diego State, Stanford and Wisconsin, (not to mention the Kansas City Chiefs).[18]

Color schemes can usually be protected as trademarks only when the color is non-functional. Football uniform colors clearly perform a function. They help avoid confusion as to team members for the benefit of officials, opposing team members and spectators.[19] *Compare Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1038-1039 (11th Cir. 1996).

(2) The uniform colors are crimson and white. Obviously, they are the same.

(3) Presumably other painters could paint similar scenes.

(4) All customers would be people who want to buy paintings depicting Alabama football plays.[20]

---

[18]For interesting histories of early use of the color crimson in a college or university athletic context see attached Exhibits 5, 6, 7, 8 and 9.

[19]See early use by Harvard in attached Exhibit 7.

[20] The plaintiff agrees that the plays and the players are not marks.

(5) The advertising media may be similar. That of the defendants would likely be more extensive and particularized.

(6) The defendants clearly intend to do what they do; that is, to depict football scenes and sell paintings. They do not believe that they are infringing,

(7) There is arguably some evidence of actual confusion which this court believes is weak if existent. The plaintiff's survey and surveyor might not be able to withstand a *Daubert* hearing. The court will not repeat the defendants' criticisms of the survey which appear to have some merit, but see this court's discussion above.

While the court deems the evidence of actual confusion to be weak, it will assume, for the purposes of this opinion, that there is at least a factual issue as to confusion. Alabama fans may purchase the paintings for reasons of loyalty and nostalgia rather than confusion. It is highly unlikely that a purchaser would not know that Moore is the moving force behind the paintings. If the statement in *Leigh v. Warner Brothers, Inc.* that, "Trademarks are not merely descriptive; they answer the question 'who made it?' rather than 'what is it?'" is applicable, the answer to "who made it" is clearly "Moore."

Defenses

The court next turns to the defenses of the defendants involving the First Amendment, Fair Use and Artistic Expression.

Artistic Expression

The plaintiff has not only acknowledged the high quality and excellence of Moore's works in depositions and in arguments, it has repeatedly applauded his work. The plaintiff has stated that Moore has "undeniable skill." That his paintings are artistic is unquestioned. They

are fine art. Each side has its respective argument as to the significance of this fact. This court concludes that the depiction of the uniforms in the paintings is incidental to the purpose and expression of the paintings; that is, to artistically depict and preserve notable football plays in the history of University of Alabama football. The only relevance of the colors is to correctly depict the scene.[21] The court in *Boston Professional Hockey Assn. V. Dallas Cap & Emblem*, 510 F.2d 1004, 1011 (5th Cir. 1975) recognized the distinction between artistic reproductions and product sales. The court stated: "We need not deal here with the concept of whether every artistic reproduction of the symbol would infringe upon plaintiffs' rights. We restrict ourselves to the emblems sold principally through sporting goods stores for informal use by the public in connection with sports activities and to show public allegiance to or identification with the teams themselves."

This court sees a total distinction between cases involving fine artistic creations and cases involving cards, T-shirts, cups, mugs, posters, mini prints, calendars, etc.[22] This court's opinion approves only paintings and prints treated as art without the use of any symbols, logos, etc. of the University of Alabama depicted thereon. It does not approve the depiction of the same paintings and prints on other products.

### First Amendment

Perhaps the landmark case on the issue is *Rogers v. Grimaldi*, 875 F.2d 994 (2d. Cir. 1980). The opinion in *Rogers* sheds light on the significance of the First Amendment in Lanham

---

[21] At the oral argument on October 20, 2009, the plaintiff agreed that if the uniforms were shown in purple, there would be no false representation of the mark. This suggests that the way to avoid a false representation is to falsely represent the scene.

[22] Mona Lisa on a mug would not be considered fine art unless the mug itself were fine sculpture.

14

Act cases. The so-called *Rogers* test has been applied in other cases involving artistic expression. The court stated: "We believe that in general the Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Id.*, at 999. Further:

> "The title "Ginger and Fred" contains no explicit indication that
> Rogers endorsed the film or had a role in producing it. The survey
> evidence, even if its validity is assumed, indicates at most that
> some members of the public would draw the incorrect inference
> that Rogers had some involvement with the film. But that risk of
> misunderstanding, not engendered by any overt claim in the title, is
> so outweighed by the interests in artistic expression as to preclude
> application of the Lanham Act. We therefore hold that the
> sponsorship and endorsement aspects of Rogers' Lanham Act claim
> raise no 'genuine' issue that requires submission to a jury."

*Id.*, at 1001.

It is not clear in *Rogers* what forms the basis for its First Amendment analysis unless it involves whether a particular application of the Lanham Act could be in violation of the First Amendment. The fact that the plaintiff here is a governmental entity could make the need to consider the First Amendment even more obvious. Even if there is some likelihood of confusion, the *Rogers* test calls for a balancing with the public interest. Also see "The Public's Domain in Trademark Law: A First Amendment Theory of the *Consumer*," Laura A. Heymann, Georgia Law Review, Spring 2009, Volume 43, No. 3. (Emphasis added.) The players might arguably have First Amendment rights.

### Source of Work

The opinion in *Leigh v. Warner Brothers*, 212 F.3d 1210 (11th Cir. 2000) provides insight to the application of the Lanham Act to photographic images. The court summarized:

> "As for Leigh's Lanham Act claims, the evidence that Leigh used the
> Bird Girl photograph to identify the source of his other work prior to
> the Warner Brothers movie is insufficient to establish the photograph
> as a trademark. We therefore affirm the district court's grant of
> summary judgment to Warner Brothers on Leigh's trademark claims."

*Id.*, at 1213.

The court's discussion includes:

> "In order to prevail on a claim of trademark infringement, a plaintiff
> has the burden of showing (1) that he had a valid trademark and (2)
> that the defendant had adopted an identical or similar mark such that
> consumers were likely to confuse the two. See 15 U.S.C. § 1125(a);
> *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106
> F.3d 355, 358 (11th Cir.1997). Trademarks are "any word, name,
> symbol, or device, or any combination thereof [used] to identify and
> distinguish [one's] goods ... from those manufactured or sold by
> others and to indicate the source of the goods." 15 U.S.C. § 1127.FN5
> Trademarks are not merely descriptive;*1217 they answer the
> question "Who made it?" rather than "What is it?" *See* 1 J. Thomas
> McCarthy, *McCarthy on Trademarks and Unfair Competition* § 3:6
> (4th ed.2000). Finally, the plaintiff's use of the mark must predate the
> defendant's potentially confusing mark. *See Tally-Ho, Inc. v. Coast
> Community College Dist.*, 889 F.2d 1018, 1022 (11th Cir.1990) (per
> curiam); 2 McCarthy, *supra*, at § 16:1, 16:4."

*Id.*, at 1216.

Further,

> "As used in the materials submitted by Leigh, the Bird Girl image
> "strikes us not as a separate and distinct mark on the good, but, rather,
> as the good itself." Rock & Roll Hall of Fame & Museum, Inc. v.
> Gentile Prods., 134 F.3d 749, 754 (6th Cir.1998)."

*Id.*, at 1218.

Fair Use

The case of *International Stamp Art, Inc. v. U. S. Postal Service*, 456 F.3d 1270 (11th

Cir. 2006) discusses the "Fair-use defense" in Lanham Act cases. The court defined "trademark"

as follows:

> "A trademark is "any word, name, symbol, or device, or any
> combination thereof [used] to identify and distinguish [one's]
> goods ... from those manufactured or sold by others and to indicate
> the source of the goods." *Gift of Learning Foundation, Inc. v.
> TGC, Inc.,* 329 F.3d 792, 797 (11th Cir.2003) (per curiam)
> (quoting 15 U.S.C. § 1127). "A plaintiff seeking to prevail on a
> trademark infringement claim must show 1) that he had a valid
> trademark and 2) that the defendant had adopted an identical or
> similar mark such that consumers were likely to confuse the two."

*Id.* at 1274.

The court further stated:

> "A fair-use defense is established if a defendant proves that its use
> is "(1) *other than as a mark,* (2) *in a descriptive sense,* and (3) *in
> good faith.*" *EMI Catalogue P'ship v. Hill, Holliday, Connors, &
> Cosmopulos, Inc.*, 228 F.3d 56, 64 (2d Cir.2000) (citing 15 U.S.C.
> § 1115(b)(4)); *see also Soweco, Inc. v. Shell Oil Co.*, 617 F.2d
> 1178, 1185 (5th Cir.1980). "The 'fair-use' defense, in essence,
> forbids a trademark registrant to appropriate a descriptive term for
> [its] exclusive use and so prevent others from accurately describing
> a characteristic of their goods." *Soweco,* 617 F.2d at 1185.
> (Emphasis added.)

*Id.*, at 1274.

. . . . .

> "Where, as here, use of the mark, as the "only [symbol] reasonably
> available" to indicate that the image on the card is meant to be a
> postage stamp, "does not attempt to capitalize on consumer
> confusion or to appropriate the cachet" of the mark holder, it fails
> to "implicate the source-identification function that is the purpose
> of trademark." *See New Kids on the Block v. News Am. Publ'g Inc.*,
> 971 F.2d 302, 308 (9th Cir.1992). Thus, it cannot constitute
> infringement."

*Id.*, at 1277.

There is no substantial evidence here, as to the artistic paintings and prints, that the

defendants "implicated the source-identification function that is the purpose of the trademark."

The defendants used their own marks to identify the source. This is evidence of good faith. *Also*

17

*see K. P. Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 2004 W.L. 2804921 (2004).

The source was clearly the artist, Daniel Moore.

Persuasive Case Excerpts on Defenses

*ETW Corp. v. JIREH Publishing, Inc.*, 332 F.3d 915 (6th Cir. 2003)[23]

> The Lanham Act provides a defense to an infringement claim where the use of the mark "is a use, otherwise than as a mark, ... which is descriptive of and used fairly and in good faith only to describe the goods ... of such party [.]"
>
> . . . . .
>
> The prints, the envelopes which contain them, and the narrative materials which accompany them clearly identify Rush as the source of the print.FN3 Woods is mentioned only to describe the content of the print.
>
> . . . . .
>
> The district court properly granted summary judgment on ETW's claim for violation of its registered mark, "Tiger Woods," on the grounds that the claim was barred by the fair use defense as a matter of law.FN4
>
> . . . . .
>
> A celebrity's name may be used in the title of an artistic work so long as there is some artistic relevance. *See Rogers v. Grimaldi*, 875 F.2d 994, 997 (2nd Cir.1989); *New York Racing Ass'n v. Perlmutter Publ'g, Inc.*, No. 95-CV-994, 1996 WL 465298 at *4 (N.D.N.Y. July 19, 1996) (finding the use of a registered mark on the title of a painting protected by the First Amendment).
>
> . . . . .
>
> Not every word, name, symbol or device qualifies as a protectable mark; rather, it must be proven that it performs the job of identification, i.e., to identify one source and to distinguish it from

---

[23]The plaintiff downplays *ETW*. The court finds it to be persuasive even if somewhat distinguishable. The general language has relevance whether in consideration of trademark or right of publicity.

other sources. If it does not do this, then it is not protectable as a trademark. *See* J. Thomas Mccarthy, Mccarthy On Trademarks And Unfair Competition, § 3:1 (2002).

. . . . .

Here, ETW claims protection under the Lanham Act for any and all images of Tiger Woods.FN5 This is an untenable claim. ETW asks us, in effect, to constitute Woods himself as a walking, talking trademark. Images and likenesses of Woods are not protectable as a trademark because they do not perform the trademark function of designation. They do not distinguish and identify the source of goods. They cannot function as a trademark because there are undoubtedly thousands of images and likenesses of Woods taken by countless photographers, and drawn, sketched, or painted by numerous artists, which have been published in many forms of media, and sold and distributed throughout the world. No reasonable person could believe that merely because these photographs or paintings contain Woods's likeness or image, they all originated with Woods.

. . . . .

[A]n ordinarily prudent purchaser would have no difficulty discerning that these photos are merely the subject matter of the calendar and do not in any way indicate sponsorship. No reasonable jury could find a likelihood of confusion.

. . . . .

In addition, Jireh has raised the First Amendment as a defense to all of ETW's claims, arguing that Rush's use of Woods's image in his painting is protected expression. Cases involving Lanham Act false endorsement claims and state law claims of the right of publicity have considered the impact of the First Amendment on those types of claims. We will begin with a discussion of the scope of First Amendment rights in the context of works of art, and will then proceed to examine how First Amendment rights have been balanced against intellectual property rights in cases involving the Lanham Act and state law rights of publicity. Finally, we will apply the relevant legal principles to the facts of this case.

. . . . .

19

The protection of the First Amendment is not limited to written or spoken words, but includes other mediums of expression, including music, pictures, films, photographs, paintings, drawings, engravings, prints, and sculptures.

. . . . .

Speech is protected even though it is carried in a form that is sold for profit. *See Smith v. California*, 361 U.S. 147, 150, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959) ("It is of course no matter that the dissemination [of books and other forms of the printed word] takes place under commercial auspices.")

. . . . .

Publishers disseminating the work of others who create expressive materials also come wholly within the protective shield of the First Amendment.

. . . . .

Even pure commercial speech is entitled to significant First Amendment protection.

. . . . .

Rush's prints are not commercial speech. They do not propose a commercial transaction. Accordingly, they are entitled to the full protection of the First Amendment. Thus, we are called upon to decide whether Woods's intellectual property rights must yield to Rush's First Amendment rights.

. . . . .

In the ordinary false endorsement claim, the controlling issue is likelihood of confusion. This court has formulated an eight-factor test to determine the likelihood of confusion. *See Landham*, 227 F.3d at 626; *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir.1988). However, for the reasons discussed below, *we conclude that where the defendant has articulated a colorable claim that the use of a celebrity's identity is protected by the First Amendment, the likelihood of confusion test is not appropriate because it fails to adequately consider the interests protected by the First Amendment*. (Emphasis added.)

. . . . .

*We believe that in general the Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression.* In the context of allegedly misleading titles using a celebrity's name, that balance will normally not support application of the Act unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work. (Emphasis added.)


In *Parks v. LaFace Records*, 329 F.3d 437 (6th Cir.2003), we joined the Second and Ninth Circuits in holding that the likelihood of confusion and "alternative means" tests do not give sufficient weight to the public interest in freedom of expression. In *Parks*, we adopted the *Rogers* test as the law of the Sixth Circuit: FN12

. . . . .

The application of *Rogers* in *Mattel*, as well as in cases decided in other circuits, *persuades us that Rogers is the best test for balancing Defendants' and the public's interest in free expression under the First Amendment against Parks' and the public's interest in enforcement of the Lanham Act.* We thus apply the *Rogers* test to the facts before us.
*Id.* at 451-52 (quoting *Rogers*, 875 F.2d at 999). (Emphasis added.)

. . . . .

A *piece of art that portrays a historic sporting event communicates and celebrates the value our culture attaches to such events. It would be ironic indeed if the presence of the image of the victorious athlete would deny the work First Amendment protection.* (Emphasis added.)

. . . . .

Turning first to ETW's Lanham Act false endorsement claim, *we agree *937 with the courts that hold that the Lanham Act should be applied to artistic works only where the public interest in avoiding confusion outweighs the public interest in free expression.* The *Rogers* test is helpful in striking that balance in the instant case. We find that the presence of Woods's image in Rush's painting *The*

*Masters Of Augusta* does have artistic relevance to the underlying work and that it does not explicitly mislead as to the source of the work.FN18 (Emphasis added.)

. . . . .

We find, like the court in *Rogers*, that plaintiff's survey evidence, even if its validity is assumed, indicates at most that some members of the public would draw the incorrect inference that Woods had some connection with Rush's print.FN19 The risk of misunderstanding, not engendered by any explicit indication on the face of the print, is so outweighed by the interest in artistic expression as to preclude application of the Act. We disagree with the dissent's suggestion that a jury must decide where the balance should be struck and where the boundaries should be drawn between the rights conferred by the Lanham Act and the protections of the First Amendment.

. . . . .

We further find that Rush's work is expression which is entitled to the full protection of the First Amendment and not the more limited protection afforded to commercial speech. When we balance the magnitude of the speech restriction against the interest in protecting Woods's intellectual property right, we encounter precisely the same considerations weighed by the Tenth Circuit in *Cardtoons*. These include consideration of the fact that through their pervasive presence in the media, sports and entertainment celebrities have come to symbolize certain ideas and values in our society and have become a valuable means *938 of expression in our culture. As the Tenth Circuit observed "[c]elebrities ... are an important element of the shared communicative resources of our cultural domain." *Cardtoons*, 95 F.3d at 972.

. . . . .

While the right of publicity allows celebrities like Woods to enjoy the fruits of their labors, here Rush has added a significant creative component of his own to Woods's identity. Permitting Woods's right of publicity to trump Rush's right of freedom of expression would extinguish Rush's right to profit from his creative enterprise.

. . . . .

22

Rush's work consists of a collage of images in addition to Woods's image which are combined to describe, in artistic form, a historic event in sports history and to convey a message about the significance of Woods's achievement in that event. Because Rush's work has substantial transformative elements, it is entitled to the full protection of the First Amendment. In this case, we find that Woods's right of publicity must yield to the First Amendment.

. . . . .

*New York Racing Assn. V. Perlmutter Publishing, Inc.*, 1996 WL 465298 (N.D. N.Y. 1996)
"Defendants currently sell shirts, blank note cards, and holiday greeting cards displaying six of Cortez's original paintings. This case involves the reproductions of these original paintings that appear on defendants' shirts, blank note cards, and greeting cards, FN6"

. . . . .

"Each of these paintings contains at least one of plaintiff's registered marks, or an image of the Saratoga Course, in the title of the painting or in the painting itself. Defendants reproduce these paintings on note cards, greeting cards, and shirts."

. . . . .

"In response to the counterclaim, plaintiff asserts that it does indeed have a property right in certain images and designs appearing in and around the Saratoga Course. Reply to Counterclaims ¶¶ 24-26. Plaintiff argues that defendants' use of these images on their shirts, note cards, and greeting cards is likely to cause confusion as to the source or sponsorship of those products because images of the Saratoga Course are inherently distinctive and/or have acquired a secondary meaning in the souvenir product marketplace; that is, consumers identify those images as plaintiff's trade dress for its souvenir products. See Plaintiff's Supplemental Memorandum of Law at pp. 3-4. FN10"

. . . . .

"To prevail on a trade dress claim under § 43(a) of the Lanham Act, a party must show that the alleged trade dress is inherently distinctive, or has become distinctive because it has acquired secondary meaning

in the relevant market. *L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co., Inc.*, 79 F.2d 258, 262 (2d Cir.1996). As stated, plaintiff claims that certain images observable at the Saratoga Course are inherently distinctive when used on souvenir merchandise such as shirts."

. . . . .

"An inherently distinctive trade dress *is one that is serves primarily as a designator of origin, and whose primary objective is source identification rather than aesthetic appeal. Knitwaves*, 71 F.3d at 1008 (quoting *Duraco v. Prods. Inc., v. Joy Plastic Enters., Inc.*, 40 F.3d 1431, 1449 (3d Cir.1994)) (other citations omitted).FN11 In this case, plaintiff has failed to proffer any evidence that plaintiff's objective in using certain images of the Saratoga Course was "primarily source identification," as required by *Knitwaves*.FN12 71 F.3d at 1008." (Emphasis added.)

. . . . .

"Lawrence Aff. at ¶ 4 and Rocco Aff. at ¶ 4. Plaintiff fails to offer any evidence that its primary purpose in using these images is to indicate that the source of its products is the NYRA."

. . . . .

Moreover, the Court does not find that plaintiff's alleged trade dress has become distinctive by acquiring secondary meaning in the relevant market. In order to establish secondary meaning, "a manufacturer must show that, in the minds of the public, the primary significance of a product feature ... is to identify the source of the product rather than the product itself." *Two Pesos, Inc.*, 112 S.Ct. at 2756 (1992)). "A mark acquires secondary meaning when it is shown that the primary significance of the term in the minds of the consuming public is not the product but the producer." *See Centaur Communications Ltd. v. A/S/M/ Communications, Inc.*, 830 F.2d 1217, 1221 (2d Cir.1987)."[24]

. . . . .

*"Even if the images observable at the Saratoga Course were entitled to trade dress protection, defendants' use of these images would be*

---

[24]It is not likely that the uniforms would be considered "products." The paintings likely would be.

*protected by both the First Amendment and the fair use doctrine. Not only does the interest of free expression outweigh the interest of avoiding consumer confusion as to the source of products displaying these images, the evidence in the record shows that defendants use the images to describe Saratoga horse racing and not as an indication of source. "* (Emphasis added.)

. . . . .

..."Thus, even though plaintiff's registered marks appear in the titles of some Cortez paintings, the Court finds that the interest of free expression weighs conclusively in defendants' favor with respect to defendants' products displaying these paintings. Therefore, the First Amendment protects these products from attack under the Lanham Act."

. . . . .

"In order to establish a fair use defense under the Lanham Act, a defendant must demonstrate that "the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark ... which is descriptive of and used fairly and in good faith only to describe the goods or services ... or their geographic origin." 15 U.S.C. § 1115(b)(4). In a case granting summary judgment to the defendants on their fair use defense, the Second Circuit stated:

It is a fundamental principle making an outer boundary of trademark monopoly that, although trademark rights may be acquired in a word or image with descriptive qualities, the acquisition of such rights will not prevent others from using the word or image in good faith in its descriptive sense, and not as a trademark.... The principle is of great importance because it protects the right of society at large to use words or images in their primary descriptive sense, as against the claims of a trademark owner to exclusivity.

*Car-Freshener Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 269 (2d Cir.1995). Thus, the crucial question under the fair use doctrine is whether the defendants are using the protected word or image descriptively. *Id.*

. . . . .

"An explicit laches defense for trademark cases is codified at 15 U.S.C. § 1115(b)(8). In order to succeed on a laches defense, a

> defendant must show: (1) that the plaintiff had knowledge of the defendant's use of its marks, (2) inexcusable delay in taking action with respect to a defendant's use of its marks, (3) prejudice to the defendant by permitting plaintiff to assert its rights at this time, and (4) good faith conduct on the part of the defendant. *Saratoga Vichy Spring Co., Inc.*, 625 F.2d at 1040 (citing *Cuban Cigar Brands, N.V. v. Upmann Int'l, Inc.*, 457 F.Supp. 1090, 1096 (S.D.N.Y.1978))."[25]

. . . . .

### Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

---

[25]This court sees no reason to consider defendants' laches argument with reference to the court's determinations with regard to defendants' rights regarding the quality paintings and prints. There is apparently no real objective time measurement standard for the defense of laches. So that this issue might be considered on appeal, the court concludes that any claims for money which accrued more than six years prior to the filing of this action are barred.

26

Once the moving party has met this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp.*, 281 F.3d at 1224 (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

"[A]t the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249 (1986). However, judges are not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such character that it would warrant the jury finding a verdict in favor of that party. *Id.* at 251 (*quoting Improvement Co. v. Munson*, 14 Wall. 442, 448 (1872)). "This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250.

### Conclusions of Court

While the court has discussed a number of issues, the conclusions upon which its judgment will be based will be limited. Some of the conclusions apply regardless of other conclusions.

The court's following conclusions, whether right or wrong, do not render ineffectual the conclusions pertaining to the Artistic Expression, First Amendment and Fair Use defenses.

(1) The colors of the uniforms in Moore's paintings may be a weak trade dress mark.

(2) The paintings may create a likelihood of confusion with regard to plaintiff's said mark.

(3) Any claims for money that accrued more than six years prior to the filing of this action are barred by laches.

(4) Defendants acknowledge and the court concludes that defendants have no right to picture or otherwise use any of the symbols, logos, marks, etc. which are pictured and "shown" as "Indicia" in the various exhibits attached hereto.

(5) The defendants have no right to manufacture, sell, distribute or otherwise deal in mugs, cups, calendars, mini prints, or any other products which include the plaintiff's marks and are not paintings and/or prints of the same or larger sizes and of equal or greater quality than the limited edition paintings and prints that defendants have heretofore created and produced.

Notwithstanding the foregoing conclusions, the court further concludes:

(1) That there is no genuine issue of material fact with regard to defendants' defenses premised on Artistic Expression, First Amendment and Fair Use as discussed above, and that defendants are entitled to prevail as to the conclusions hereinafter stated based on either, any or all of said defenses, combined or otherwise, with regard to the paintings and prints of fine art quality as discussed  This conclusion includes a determination that even if there is a likelihood of confusion, the balancing of such likelihood and the public interest entitles defendants to prevail.

(2) That the defendants have not and will not infringe on any trademark or trade dress mark of the plaintiff by creating, manufacturing, producing, selling, distributing or otherwise dealing in paintings and/or prints which are of the same or larger size and equal or greater quality

28

than the limited edition paintings and prints that the defendants have heretofore created and produced.

(3) That the license agreements previously entered into by the plaintiff and the defendants do not include as designated "Indicia" the depictions in the images of limited edition paintings and prints heretofore created and produced by the defendants, and that said license agreements do not otherwise bar the defendants from creating, manufacturing, producing, selling, distributing or otherwise dealing in said paintings and prints of the limited edition types previously created, manufactured, produced, sold and distributed by the defendants.

Within ten (10) calendar days, the parties may submit to the court any suggested language (not more than four (4) pages) to add, delete, correct or otherwise change which might avoid a later misunderstanding of the court's intentions. Further, within said period, the parties may submit a suggested proposed final judgment (not more than four (4) pages) consistent with the foregoing opinions. The parties will have seven (7) calendar days thereafter to respond (not more than four (4) pages).

This the 2nd day of November, 2009.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE