FILED

2013 Sep-27  PM 05:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| **THE UNIVERSITY OF ALABAMA** | ) | |
| **BOARD OF TRUSTEES,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action Number: |
| v. | ) | **7:05-cv-0585-AKK** |
| | ) | |
| **NEW LIFE ART, INC., et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This case is on remand from the Eleventh Circuit for the court to resolve the remaining contractual issues "related to [Daniel] Moore's depiction of the University[] [of Alabama's] uniforms on 'mini-prints, mugs, cups, . . . flags, towels, t-shirts, or any other mundane products,'" i.e., "mugs and other 'mundane products.'" *See* doc. 342-1 at 26 (*Univ. of Alabama Bd. of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1279 (11th Cir. 2012)). The parties agree that the only remaining issue in this case is whether Moore and New Life Art, Inc. (collectively "New Life") "re-issued prints, etc., without the University's permission," *id.* at 7 n.7, in violation of the parties' agreements for New Life to issue "limited edition" prints, docs. 344 at 1, 8–9; 349 at 10–11. As the Eleventh Circuit framed it, "the district court upon remand will need to resolve the University's claims that (1)

[New Life] re-issued one product whose licensing agreement specifically prohibited issuance without first receiving the University's permission, and (2) [New Life] has failed to pay royalties when [it] later re-issued certain works that had explicitly been the subject of a licensing agreement." Doc. 342-1 at 16 n.29 (citing docs. 260 at 28; 262-5 at 6 ¶ 9).

The University's and New Life's cross motions for summary judgment are presently before the court. Docs. 344 and 350. The motions are fully briefed. Docs. 348–49, 351–52. In a nutshell, the University contends New Life breached licensing agreements regarding five "limited edition" prints of paintings depicting scenes of the University's football team when New Life reissued the prints in "mugs and other mundane products." *See* doc. 344. Alternatively, the University contends that, even if the court finds that New Life has not breached the agreements, it is due to prevail based on New Life's unjust enrichment from the sale of the re-issued products. *See* doc. 344. New Life counters that it has not breached any of the agreements because "limited edition" referred solely to sizes and formats, that the agreements only precluded New Life from using the University's "indicia," and that the "mugs and other mundane products" it issued did not bear the University's "indicia" and were sold in different sizes and formats than the "limited edition" prints. *See* doc. 348. Moreover, New Life asserts that,

even if the court finds that it breached the agreements, it is still due to prevail because the University acquiesced in the sale of the re-issued products when the University purchased and resold unlicensed calendars from New Life that included the "limited edition" prints at issue.  *See* doc. 350.

Based on the court's review of the law and the facts in this case, the court finds that New Life breached one of the five licensing agreements—specifically the agreement covering "The Interception" print—but the University acquiesced in New Life's breach by purchasing and selling "mugs and other mundane products" containing this print, and is therefore precluded from recovering damages based on the theory of breach of contract. The court further determines that the University is not entitled to damages based on the theory of unjust enrichment. Accordingly, New Life's motion for summary judgment is due to be granted, and the University's motion is due to be denied.

## I. <u>SUMMARY JUDGMENT STANDARD OF REVIEW</u>

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Id*. However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (*per curiam*) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560,1563 (11th Cir. 1989)).

## II. <u>FACTUAL BACKGROUND & PROCEDURAL HISTORY</u>

Since 1979, Moore has painted historic University of Alabama football scenes depicting the University's football players and coaches and has reproduced his paintings as prints, calendars, mugs, and other articles. *See* doc. 3 at 14; doc. 262 ¶ 28. Perhaps naturally, the University and Moore, an alumnus of the

University, developed a relationship. Eventually, from 1991 to 1999, the

University and New Life executed agreements to produce and market five "limited

edition" fine art prints. The agreements include: (1) "Crimson Legacy"—signed in

October 1991, doc. 262-2, (2) "The Tradition Continues"—signed in January 1993,

doc. 262-3, (3) "The Interception"—signed in April 1994, doc. 262-5, (4) "The

Winning Connection"—signed in December 1994, doc. 262-7, (5) the General

Licensing Agreement—signed in June 1995, doc. 262-8, and (6) "The Grand

Finale," through an addendum to the General Licensing Agreement—signed in

November 1997, doc. 262-11.[1] *See* doc. 262 at 6 ¶ 28. Additionally, through

addenda, the parties renewed the 1995 General Licensing Agreement annually

through 2000. *See id.* In each agreement, New Life agreed to pay the University

royalties based on a percentage of the revenue generated during the term of the

agreement. Doc. 262-3 at 4. Each agreement stated that the University's rights

survived the term of the agreement. *See* docs. 262-2 at 9–10 ¶ 18(a); 262-3 at 8 ¶

17(a); 262-5 at 7 ¶ 9; 262-7 at 8 ¶ 17(a); 262-8 at 10 ¶ 22(a).

---

[1]Except for "The Interception," the agreements are actually between New Life and Centennial
Marketing/Collegiate Licensing Company/International Collegiate Enterprises, Inc., which are
entities that "represent[ed] the licensing interests of the University," and who had "the exclusive
right, as agent, to license . . . for commercial purposes the use of certain University Indicia."
Doc. 262-2 at 2; *see also* 262-3 at 2; 262-5; 262-7 at 2; 262-8 at 2; 262-11 at 2.

Relations between the parties soured when the University asserted that New Life needed to obtain licensing agreements to depict the University's trademarks and licensed indicia on New Life's other University-related products, i.e., prints, calendars, and "mugs and other mundane products." *See* docs. 3 at 16–17; 258-2 at 7; 351-2 at 15, 34. According to the University, New Life needed permission to portray the University's uniforms (the jersey, helmet designs, and the crimson and white colors) on these products because the uniforms were protected "trade dress" rising to the level of trademarks. *See* doc. 351-3 at 45–48. New Life maintained that the depiction of the University's uniforms within the "image area" of New Life's paintings enjoyed First Amendment protection since the paintings consisted of historical events. Docs. 351-2 at 15; 351-3 at 46–47.

Despite the disagreement, the University continued to sell New Life's unlicensed calendars that contained the disputed prints in its campus stores. From 2001 to 2004, the University sold over $12,000 worth of unlicensed calendars. Doc. 294-20 at 2–10. In fact, on at least one occasion, the University framed the images from an unlicensed calendar and sold the framed prints. Doc. 116-9 at 25. The University also displayed and sold unlicensed paintings at the University-run Paul W. Bryant Museum. Doc. 116-11 at 9–12.

The University eventually sued Moore and New Life in 2005 for breach of contract, trademark infringement, unfair competition, and unjust enrichment. Doc. 1. New Life counterclaimed, arguing, in part, that Moore's artwork is protected by the First Amendment, and sought declaratory relief for Moore's rights under the Lanham Act. *See* doc. 3. On cross motions for summary judgment, in an opinion written by Judge Robert Propst, this court held that Moore's First Amendment rights prevailed over the University's trademark claims with regard to the fine art paintings and prints, and that New Life had not "infringe[d] on any trademark or trade dress mark of [the University] by creating, manufacturing, producing, selling, distributing or otherwise dealing in paintings and/or prints which are of the same or larger size and equal or greater quality than the limited edition paintings and prints that [New Life had] heretofore created and produced." Doc. 311 at 28–29. Also, noting that the agreements did not include uniforms in the definition of "licensed indicia," Judge Propst found that the parties did not intend for "licensed indicia" to include colors on uniforms. *Id*. at 3–4. Consequently, Judge Propst granted New Life partial summary judgment on the paintings and prints, specifically holding that Moore's depiction of the University's uniforms in his paintings and prints did not infringe on the University's protectable trade dress mark. However, Judge Propst found for the University with respect to Moore's use of the University's

uniforms on calendars and "mugs and other mundane products." *See* docs. 311,
322.

      Both parties appealed. *See* doc. 342-1. The main issue on appeal centered on
whether the First Amendment protected Moore's depiction of the University's
football uniforms in paintings, prints, calendars, and "mugs and other mundane
products," or if the University had a protected trademark in its uniforms. *Id*. The
Eleventh Circuit declined to address the "claims involving objects which were the
specific subject of a particular, written licensing agreement, and with respect to
which the University argues that Moore re-issued prints, etc., without the
University's permission." *Id.* at 7 n.7. However, with respect to the Lanham Act
claims, the court affirmed the district court regarding the paintings and prints, but
reversed with respect to calendars. The Eleventh Circuit held that depictions of the
University's uniforms in Moore's paintings, prints, *and calendars* did not violate
the Lanham Act because New Life had a First Amendment right to include the
University's color, trade dress/uniforms, and trademark symbols in the artwork,
prints, and calendars that celebrated and commemorated the historic moments in
Alabama football. *Id.* at 25–26. With respect to the portrayal of the University's
uniforms on "mugs and other mundane products," the court found that the
licensing agreements were ambiguous as to whether New Life needed permission

to portray the University's uniforms on these items and, consequently, reversed the summary judgment in favor of the University. *Id*. at 26–28.

On remand, the Eleventh Circuit instructed this court to resolve the University's claims that New Life re-issued products in violation of the licensing agreements, *id.* at 16 n.29 (citing docs. 260 at 28; 262-5 at 6 ¶ 9), and to conduct further proceedings, if necessary, on New Life's acquiescence defense. On this issue, the court stated that "a finding of acquiescence on the mugs or other 'mundane products' would estop the University from prosecuting its action against Moore with respect to those items, unless the University can show that 'inevitable confusion' arises from the continued dual use of the marks." Doc. 342-1 at 32 (internal citation omitted).

### III.  <u>ANALYSIS</u>

The parties have filed cross motions for summary judgment on the remaining issues, i.e., whether New Life purportedly breached the licensing agreements by re-issuing the "limited edition" prints in different sizes and placing the images on calendars and "mugs and other mundane products." According to the University, the contractual language "clearly prohibit[s] New Life from 'sell[ing] or otherwise deal[ing] in any Prints or other products'" without the University's permission. Doc. 349 at 4 (emphasis removed). New Life counters that the

licensing agreements[2] granted it the right to sell products using Moore's copyrighted prints that do not bear the University's "licensed indicia" and that "limited edition" referred solely to prints bearing the University's "indicia" and the number of prints New Life could sell measuring a certain size and format. Docs. 350 at 7; 348 at 8–10; 352 at 4–7. In a nutshell, the court must decide whether the terms of the agreements dictate licensing of the prints or licensing of the "indicia," whether the "limited edition" prints include prints without the "indicia," and the role New Life's copyrights play in relation to the licensing agreements. The court's analysis of the parties' respective contentions begins in section A with the University's claim that New Life breached the agreements and New Life's assertion that the University acquiesced to New Life's depictions of the images on the prints and "mugs and other mundane products." Finally, in section B, the court addresses the University's alternate contention that it is due to prevail on an unjust enrichment theory.

---

[2]Out of the five licensing agreements and one addendum at issue, the parties acknowledge that only "The Interception" agreement is significantly different in the language used. In fact, "The Interception" agreement is apparently not a true licensing agreement at all. *See* doc. 262-5. Because of the vast differences between this agreement and the other four, the court will take up the parties' contentions regarding "The Interception" separately in Section A(2). In other words, references to the "contracts" or the "agreements" in Section A(1) do not include "The Interception" agreement.

## A.    Breach of Contract

Under Alabama law,[3] "[w]hen interpreting a contract, a court should give the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state." *Public Bldg. Auth. of City of Huntsville v. St. Paul Fire and Marine Ins. Co.,* 80 So. 3d 171, 180 (Ala. 2010) (internal citations omitted). "If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court and, when appropriate, may be decided by a summary judgment." *McDonald v. U.S. Die Casting & Dev. Co.*, 585 So. 2d 853, 855 (Ala. 1991) (citing *Dill v. Blakeney,* 568 So. 2d 774 (Ala. 1990)). However, a court may not twist the plain meaning of the terms to create an ambiguity under the guise of interpretation. *Southland Quality Homes, Inc. v. Williams,* 781 So. 2d 949, 953 (Ala. 2000) (citing *Universal Underwriters Life Ins. Co. v. Dutton,* 736 So. 2d 564, 570 (Ala. 1999)). Moreover, the determination of whether an instrument is

---

[3]With respect to choice of law, three of the agreements are governed by Georgia law, and two by Alabama law. *See* docs. 262-2 at 11; 262-3 at 10; 262-5 at 9; 262-7 at 10; 262-8 at 11. However, since the relevant rules for contract interpretation are generally the same under Alabama and Georgia law, *see Bd. of Com'rs of Crisp County v. City Com'rs of City of Cordele*, 727 S.E. 2d 524, 526–28 (Ga. Ct. App. 2012) (citing *Holcim (US), Inc. v. AMDG, Inc.*, 596 S.E. 2d 197 (Ga. Ct. App. 2004); *ALEA London Ltd. v. Woodcock*, 649 S.E. 2d 740 (Ga. Ct. App. 2007); *Verret v. ABB Power T & D Co.*, 515 S.E. 2d 435 (Ga. Ct. App. 1999); *Payne v. Middlesex Ins. Co.*, 578 S.E. 2d 470 (Ga. Ct. App. 2003)) (detailing the rules for contract construction under Georgia law), and since the parties acknowledge implicitly that a resolution of their dispute does not hinge on which state's law the court applies, the court's analysis will focus only on Alabama law.

ambiguous is a question of law, *Austin v. Cox*, 523 So. 2d 376, 379 (Ala. 1988),

and one which the court should analyze by "apply[ing] the common interpretation

of the language alleged to be ambiguous." *Miller v. Allstate Ins. Cos.*, 896 So. 2d

499, 503 (Ala. Civ. App. 2004) (quotation marks and citations omitted); *see also*

*Caribbean I Owners' Ass'n, Inc. v. Great Am. Ins. Co. of N.Y.*, 600 F. Supp. 2d

1228, 1245 (S.D. Ala. 2009) (internal quotation marks omitted) ("ambiguities

cannot be constructed from thin air by strained or twisted reasoning in interpreting

the language"). In doing so, "the court must examine more than an isolated

sentence or term; [rather,] it must read each phrase in the context of all other

provisions." *Royal Ins. Co. of Am. v. Thomas*, 879 So. 2d 1144, 1154 (Ala. 2003)

(citations and internal quotations marks omitted).  Significantly, "[e]ven if some

ambiguity does exist in a contract, a court has the duty to accept a construction that

will uphold the contract, rather than one that will make it invalid." *McDonald*, 585

So. 2d at 855 (citing *Wilson v. World Omni Leasing, Inc.,* 540 So. 2d 713, 716

(Ala. 1989)).

### 1. *The Crimson Legacy, The Tradition Continues, The Winning Connection, and The Grand Finale Prints*

Consistent with the general principles of contract interpretation, the court

begins its analysis with the terms of the licensing agreements. The parties agree

generally that the agreements granted New Life the right to produce "limited

edition," fine art prints utilizing the University's "indicia." The disagreement centers on New Life's rights to the prints, if any, after the agreements expired. The University maintains that the agreements prohibited New Life from utilizing the prints with other formats and New Life maintains the prohibition applied solely to the University's "indicia." Relevant to this dispute, the agreements state that "[a]fter expiration or termination of this Agreement for any reason, [New Life] shall refrain from further use of **the Indicia** or any further reference to them," and "shall have no further right to manufacture, advertise, distribute, sell, or otherwise deal in any **Prints or other products which utilize the Indicia** . . . ." *See* docs. 262-2 at 9 ¶ 16(b); 262-3 ¶ 15(b); 262-5 ¶ 11; 262-7 ¶ 15(b); 262-8 ¶ 20(b) (emphasis added). In other words, contrary to the University's contention, the agreements did not prohibit New Life from re-issuing the "limited edition" prints. Rather, based on the plain language of the agreements, the parties agreed only that New Life would not use the University's "indicia" after the agreements expired. Therefore, the resolution of this matter turns, in part, on the meaning of "indicia."

Only two of the agreements, "Crimson Legacy" and the 1995 General Licensing Agreement, define "indicia." "Crimson Legacy" defines it as:

> the names, symbols, designs, and colors of the University, including without limitation, the trademarks, service marks, designs, logographics, slogans and other symbols or terms that have been developed, adopted and/or used by the University in connection with its centennial

celebration programs. Indicia are set forth in Appendix B attached hereto. Indicia also includes or incorporates various other standard University indicia if such indicia are approved for use herein.

Doc. 262-2 at 2 ¶ 1(b). Similarly, the 1995 General Licensing Agreement, cited in

Eleventh Circuit opinion, states:

> "Licensed Indicia" means the names, symbols, designs, and colors of the [University], including without limitation, the trademarks, service marks, designs, team names, nicknames, abbreviations, city/state names in the appropriate context, slogans, logographics, mascots, seals and other symbols associated with or referring to the [University]. Licensed Indicia includes those in Appendix B and indicia adopted, used and approved for use by the [University]. Any newly adopted indicia shall be deemed to be additions to the Licensed Indicia in Appendix B and shall be subject to the terms and conditions of the Agreement.

Doc. 262-8 at 2 ¶ 1(b). The appendices, in turn, state that the:

> University is the owner of all rights, title, and interest in and to the following Indicia, which includes trademarks, service marks, trade names, designs, logos, seals and symbols
>
> VERBIAGE
> University of Alabama ®
> Roll Tide ®
> Crimson Tide ®
> U of A ®
> Bama ®
> Alabama ®

Docs. 262-2 at 13; 262-3 at 11. Also, the graphics displayed in the appendices

include four main images: (1) a big "A" with an elephant coming through the

middle of the "A," (2) the University's seal, (3) an elephant standing up wearing a

sweater with an "A" on it, and (4) a big "A" with the University's seal in the middle of it. Docs. 262-2 at 13; 262-3 at 11.

Based on this contractual language, New Life contends that "indicia" refers only to the University's symbols, verbiage, and seals used in packaging or on the border of the image, rather than the actual prints. Docs. 350 at 6; *see e.g.*, docs. 262-2 at 6; 262-3 at 5; 262-7 ¶ 7(b). Consequently, based on its copyrights, New Life asserts that it has the right to publish derivative or ancillary works (with the exception of "The Interception") that do not use the University's "indicia." Doc. 348 at 15. The language of the agreements supports New Life's contention. For example, the agreements state that New Life "acknowledges that any rights, including copyright or other proprietary rights that it might have in artwork or designs created by it pursuant to this Agreement, extend only to those elements of the artwork or designs *which are not part of or included in the Indicia or any derivatives*." Doc. 262-7 at 5 ¶ 7(b) (emphasis added). In light of this and other similar language, the court finds that the unambiguous terms of the agreements show clearly that New Life simply licensed the use of the University's "indicia"—the trademarked symbols, "official product" language, and special medallions and packaging, *see* docs. 262-2 at 13; 262-3 at 11,and that the agreements did not prohibit New Life from using its artwork in other products. As

the Eleventh Circuit noted, the contractual "language implie[d] that the parties

intended 'licensed indicia' to refer to the packaging or labels placed upon products,

rather than uniforms depicted within the content of a painting, print, or calendar"

since the agreements refer to products "bearing" the indicia. *See* doc. 342-1 at

12–13. The Circuit reached this finding, in part, by pointing out that the

agreements required that New Life label the "indicia" as either a registered

trademark or a non-registered mark, *see* doc. 262-8 at 6, that there is no evidence

that such labels were included in the content of the image area, and that "[u]nder

the University's view, this would apparently require that every player portrayed in

a painting would need an "R" or "TM" symbol accompanying his uniform," doc.

342-1 at 13. Therefore, since the language in the agreements only prohibits New

Life from producing "any Prints or other products which utilize the Indicia," *see*

docs. 262-2 at 9 ¶ 16(b), and because there is no evidence New Life re-issued

products that "utilized" the University's indicia, the court finds that New Life and

Moore have not breached the licensing agreements related to "Crimson Legacy,"

"The Tradition Continues," "The Winning Connection," and "The Grand Finale"

when they used these prints to produce derivative products and that their motion

for summary judgment is due to be granted.[4]

---

[4]The holding is the same even if the terms of the agreements are even remotely ambiguous
because, "under the rule of *contra proferentem,* any ambiguity must be construed against the

## 2.    *"The Interception" Agreement*

The parties agree that "The Interception" agreement is not a licensing agreement and does not address New Life's right to use the University's "indicia." In fact, the terms "indicia," "licensee," and "licensing" are not used in this agreement. *See* doc. 262-5. Moreover, New Life concedes that "The Interception" agreement, which covered a print depicting a student-athlete with remaining eligibility, is more restrictive than the other agreements. Doc. 348 at 13. Specifically, because of the remaining eligibility, National Collegiate Athletic Association rules required that the University publish and distribute the prints. Doc. 351 at 8. Consequently, the agreement specifically provided that the "limited edition prints will be *produced and sold exclusively by the University*" and "[a]ll material prepared for public distribution must indicate that the University is the publisher and seller of the limited edition prints."[5] Doc. 262-5 at 2 ¶ 1 and 3 ¶ 2

---

drafter of the contract." *Extermitech, Inc. v. Glasscock, Inc.,* 951 So. 2d 689, 694 (Ala. 2006) (citation omitted); *but see FabArc Steel Supply, Inc. v. Composite Const. Systems, Inc.,* 914 So. 2d 344, 357 (Ala. 2005) (*contra proferentem* "is generally a rule of last resort that should be applied only when other rules of construction have been exhausted") (citations omitted).

[5]Based on this restrictive language, and the clause stating that, except as provided in the agreement, New Life "shall not create, reproduce, print or publish any prints or posters, *limited edition or otherwise*, or any ancillary products or items from the original art work without the prior written consent of the University," doc. 262-5 at 6 ¶ 9 (emphasis added), New Life contends that "The Interception" agreement supports its assertion that it did not breach the other agreements. Basically, New Life contends that the parties could have negotiated similar language restricting New Life in the other agreements if they so intended and that the absence of similar language in the other agreements indicates that the parties did not intend for those agreements to prohibit New Life from producing the other prints in non-"limited edition"

(emphasis added). In light of this language, New Life clearly breached "The Interception" agreement when it produced and sold derivative products of the prints covered by that agreement. *See* docs. 348 at 13–14; 352 at 5–6.

### 3. *Equitable Defense: Acquiescence*

Although it admits breaching "The Interception" agreement, New Life contends that the University's acquiescence precludes the University from recovering damages. *See* doc. 350. Acquiescence, a form of estoppel, is an equitable remedy used to promote equity and justice by preventing a party from asserting rights under a technical rule of law when its own conduct renders the assertion of such rights contrary to equity and good conscience. *First National Bank of Opp v. Boles*, 165 So. 586, 592 (Ala. 1936); *see also Mazer v. Jackson Ins. Agency*, 340 So. 2d 770, 772 (Ala. 1976) (citation omitted) (Estoppel is "interposed to prevent injustice and to guard against fraud by denying to a person [or entity] the right to repudiate his acts, admissions, or representations, when they have been relied on by persons to whom they were directed and whose conduct they were intended to and did influence."). Relevant to this case, "[a] contract will

---

formats. Doc. 352 at 5–6. New Life further asserts that the difference is critical since "The Interception" was the third of five agreements and the only one in which the University explicitly includes the limiting language. *Id*. The court does not have to reach this argument in light of its finding that the agreements only prohibited New Life from producing "any Prints or other products which utilize the [University's] Indicia . . . ." *See* Doc. 262-2 at 9 ¶ 16(b).

be treated as abandoned or rescinded where the acts and conduct of one party inconsistent with its existence are acquiesced in by the other party." *Humphreys v. Laile,* 398 So. 2d 703, 705 (Ala. Civ. App. 1981); *see also Matthews v. S.A. Martin & Motors,* 394 So. 2d 943, 944 (Ala. 1981). The acquiescing party does not have to do so by an "explicit statement" because the court can infer abandonment from all the circumstances surrounding the conduct of the parties. *Matthews,* 394 So. 2d at 944. However, the court can only find abandonment or rescission "when such acts and conduct of the one and the acquiescence of the other are found by the trier of facts to be positive and unequivocal." *San–Ann Service, Inc. v. Bedingfield,* 305 So. 2d 374, 377 (Ala. 1974).

To support its acquiescence defense, New Life contends that the University knew that New Life included "The Interception" print in its 2004 calendar and that the University purchased, sold, and profited from the resale of that calendar. Doc. 348 at 11–13. Allegedly, the University sold approximately 360 of the unlicensed calendars with "suitable for framing art prints" that included "The Interception," and purportedly cut out, framed, and sold some of the images, at times with commemorative coins on them. *See* docs. 294-20 at 3; 352-2; 81-15 at 2–3; 81-12 at 7, 15–18. New Life asserts that these acts establish the University's consent to the sale of these unlicensed items. Docs. 350 at 7–9.

The University raises two points in response. First, the University asserts that New Life waived its acquiescence defense by failing to specifically plead it in its answer. *See* doc. 351 at 15. This contention is unavailing since New Life asserted the equitable defense of laches, which is similar to acquiescence, in its answer and specifically raised the acquiescence defense in an earlier summary judgment motion. *See* docs. 3 at 12; 77 at 2; 79-1 at 19–26; *see also* doc. 117 at 18–27 (The University's substantive response to New Life's acquiescence defense). Additionally, New Life included acquiescence as a defense in the Pretrial Order approved by the parties for the jury trial set in 2008. Doc. 163. Moreover, the failure to plead acquiescence specifically in the answer is not dispositive. While "[a]dmittedly, the general rule is that, when a party fails to raise an affirmative defense in the pleadings, that party waives its right to raise the issue at trial[,] . . . the liberal pleading rules established by the Federal Rules of Civil Procedure apply to the pleading of affirmative defenses." *Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263–64 (11th Cir. 1988) (citing *American National Bank v. Federal Deposit Insurance Corp.,* 710 F.2d 1528, 1537 (11th Cir. 1983)). "The court must avoid hypertechnicality in pleading requirements and focus, instead, on enforcing the actual purpose of the rule." *Id.* In that regard, "[t]he purpose of Rule 8(c) is simply to guarantee that the opposing party has notice of any additional

issue that may be raised at trial so that he or she is prepared to properly litigate it." *Id*. (citing *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 350 (1971)). Therefore, when, as here, "a plaintiff has notice that an affirmative defense will be raised at trial, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice. And, when the failure to raise an affirmative defense does not prejudice the plaintiff, it is not error for the trial court to hear evidence on the issue." *Id*. (citing *Bull's Corner Restaurant v. Director of the Federal Emergency Management Agency,* 759 F.2d 500, 502 (5th Cir. 1985)); *see also Jones v. Miles,* 656 F.2d 103, 107 n.7 (5th Cir. 1981) ("Failure to affirmatively plead the defense is simply noncompliance with a technicality and does not constitute a waiver where there is no claim of surprise."). Based on the facts here, even ignoring the laches defense New Life raised in its answer, there is no prejudice or unfair surprise to the University in allowing New Life to raise acquiescence since the University received notice of the defense as early as 2006. *See* docs. 77, 79.

Alternatively, the University contends that New Life cannot establish acquiescence since it informed New Life in 2002 that it objected to New Life's unauthorized use of its marks. This contention fails also because the record shows that the University purchased calendars containing "The Interception" print *after*

the meeting in 2002 in which the University noted its objection. *See* doc. 352-2 at

1. To establish equitable estoppel, New Life must show: (1) the actor, who usually

must have knowledge of the facts, communicates something in a misleading way,

either by words or conduct, or silence, (2) another relies upon that communication,

and (3) the other party would be harmed materially if the actor is later permitted to

assert any claim inconsistent with his earlier conduct. *In re Joe Morgan, Inc.*, 985

F.2d 1554, 1562 (11th Cir. 1993) (citing *Ex parte Baker,* 432 So. 2d 1281, 1285

(Ala. 1983)); *see also Ford v. Jackson Square, Ltd.,* 548 So. 2d 1007 (Ala. 1989).

New Life has established these elements by showing (1) that the University

purchased and sold New Life's unlicensed 2004 Calendar that included a "suitable

for framing art print" of "The Interception," (2) that New Life relied upon the

University's acquiescence when it continued to sell the University its unlicensed

calendars, and (3) that the University knew New Life would be harmed if the

University subsequently asserted a position that was inconsistent with its actions

allowing New Life to sell its unlicensed calendars. *See In re Joe Morgan, Inc.*, 985

F.2d at 1562. Moreover, unlike the other agreements, the University failed to

include a "no waiver of rights" clause in "The Interception" agreement.[6] The

---

[6]The other agreements contain "NO WAIVER, ASSIGNMENT, ETC." sections, which
specifically state that "failure of either party to require performance of any term in this
agreement or the waiver by either party of any breach thereof shall not prevent subsequent
enforcement of such term nor be deemed a waiver of any subsequent breach." Docs. 262-2 at ¶

failure to include this language communicates something in a misleading way and

suggested to New Life that the University regarded this print differently from the

others. Put differently, the University's decision, first, to not include the "no

waiver" clause, and, second, to sell the unlicensed calendars, establishes

acquiescence. Accordingly, the court holds that New Life has established that the

University acquiesced to its breach of "The Interception" agreement and that

justice and equity require a finding that the University is estopped from asserting

its claim of breach of contract with regard to that agreement.

## B.     Unjust enrichment claim

Finally, the University contends that, even absent a contractual breach, it is

entitled to relief because New Life enriched itself unjustly by taking advantage of

the University's marketing efforts in order to mislead the University's fans and

alumni into believing that the University would receive royalties from purchases of

the unlicensed prints and "mugs and other mundane products." Docs. 344 at 8–9;

349 at 10–11. The University asserts that its promotion of the original licensed

products resulted in a nine fold increase of New Life's sales and that by

purportedly failing to distinguish the "limited edition, officially licensed" prints

from the other materials it sells, "New Life [is] committing a fraud on the

---

22; 262-3 at ¶ 21; 262-7 at ¶ 21; 262-8 at ¶ 27.

consuming public through it [sic] sale of these Reissued Products." Doc. 349 at 10–12.

"The doctrine of unjust enrichment is an old equitable remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another." *Mantiply v. Mantiply*, 951 So. 2d 638, 654 (Ala. 2006) (quoting *Avis Rent A Car Sys., Inc. v. Heilman*, 876 So. 2d 1111, 1123 (Ala. 2003)). "In order for a plaintiff to prevail on a claim of unjust enrichment, the plaintiff must show that the defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendant because of mistake or fraud." *Id*. (internal quotation marks and citations omitted). "In order to prove fraud, the plaintiff must establish that there was a misrepresentation of a material fact, that it was made willfully to deceive or recklessly without knowledge, that it was justifiably relied upon, and that it thereby proximately caused damage to the plaintiff." *McLemore v. Ford Motor Co.*, 628 So. 2d 548, 550 (Ala. 1993). The University failed to make this showing.

The University's sole basis of fraud or misrepresentation is its contention that New Life created confusion in the marketplace by failing to differentiate between the licensed and the unlicensed products. Doc. 348-9 at 21. However, this

contention is insufficient to establish the fraud necessary for an unjust enrichment

claim. As the University concedes, it has no evidence of fraud:

> Q: But do you know of any occasions when he [Moore] lied, said
> something that was absolutely false or New Life lied, said something that
> was absolutely false that some work that showed Alabama in the image
> area was licensed when it really wasn't?
>
> A: No.
>
> Q: Or that it lied saying it was sponsored or gained its origin from the
> University of Alabama when it wasn't?
>
> A: No.

Doc. 348-9 at 22 (deposition of University Corporate Representative, Finus

Gaston, Vol. III). Significantly, it is undisputed that the University benefitted

financially from the sale of the "limited edition" prints through unlicensed

calendars and framed prints at the University's campus stores, *see* doc. 294-20, and

non-financially since it admits that Moore's artwork has "done positive things for

the university," *see* doc. 348-3 at 45–46. Finally, the unjust enrichment claim fails

also because of the University's unclean hands through its acquiescence in

purchasing and selling the unlicensed calendars with the prints at issue. *See*

*Matthews v. Matthews*, 288 So. 2d 110, 119 (1973) ("The familiar maxim, 'He who

comes into equity must come with clean hands', which, expressed in different

form, 'He that committeth iniquity shall not have equity,' is recognized as a

fundamental principle of equity jurisprudence which governs the discretionary powers of courts of equity in the exercise of their remedial functions and furnishes a universal rule affecting their entire administrations as to remedies and remedial rights."). For all these reasons, the University is not entitled to damages based on the theory of unjust enrichment.

## IV.  CONCLUSION

Consistent with this opinion, the court will issue a separate order denying the University's motion for summary judgment and granting New Life's motion.

**DONE** this 27th day of September, 2013.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE